[Crim. No. 9422. Third Dist. Sept. 27, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT RAYMOND PETERSON et al., Defendants and Appellants.

## COUNSEL

Mark M. Reese, under appointment by the Court of Appeal, Quin Denvir, State Public Defender, Ezra Hendon, Chief Assistant State Public Defender, and Richard E. Shapiro, Deputy State Public Defender, for Defendants and Appellants.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Willard F. Jones and Edmund D. McMurray, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

EVANS, J.—At the conclusion of a 35-day factually complex trial, the jury found defendants Peterson and Fruean guilty of all 11 counts of an information which charged them with armed robbery and kidnaping for purposes of armed robbery of Michael Duran and Librada Valenzuela (Pen. Code, §§ 211, 209); armed robbery of Timothy Cook (Pen. Code, § 211); conspiracy to commit kidnaping for purposes of robbery of Michael Duran and Librada Valenzuela (alleged with overt acts, Pen. Code, § 182); armed robbery, kidnaping with bodily injury and rape of Joanne W. (Pen. Code, §§ 211, 209, 261, subds. 2 and 3); and armed robbery and kidnapping for purposes of robbery of John Purpur (Pen. Code, §§ 211, 209). The substantial issues presented in this appeal concern the legality of the traffic stop and detention of Darwin Sights, evidence gained as a result of that detention, and the subsequent arrests of the defendants.

The record discloses a sordid, brutal, and obscene skein of facts demonstrating a callous disregard for life, safety, personal rights, and property of others during a one-week crime spree affecting five victims. As the defendants do not directly challenge the sufficiency of the evidence to establish their guilt, the following recitation of facts will suffice for our consideration of the defendants' principal contentions.

The criminal activity began at 6 p.m. on January 6, 1977. At that time defendants participated in the armed kidnaping and robbery of Librada Valenzuela and Michael Duran; a short time later the defendants, while in the car stolen in the kidnaping of Michael and Librada, committed an armed robbery of a Regal service station in which they threatened to kill the attendant, Timothy Cook. One week later, while again armed with a pistol and rifle, the defendants kidnaped, robbed, and after subjecting the victim Joanne W. to verbal and physical abuse, raped her and stole her 1970 Mercury Cougar. Later that evening, in similar fashion, John Purpur was kidnaped and his car taken as he was leaving his place of business. When his vehicle, a 1969 Camaro, was recovered, a stereo tape deck had been removed from the glove compartment.

Shortly after the kidnap-rape of Joanne W., Highway Patrol Officer Swift, while using a pay telephone at a gas station adjacent to a darkened and unoccupied office building, observed a dark colored 1970 Mercury Cougar with its lights off and engine running in the unlighted parking lot. An occupant was noticed in the right front seat. Swift observed the individual identified as Darwin Sights run from the east side of the building, enter the Cougar, and hurriedly drive off. As the Cougar passed the telephone booth, the driver noticed Swift and appeared to be startled by the officer's presence. The area was known to Swift as a high crime area; that fact and the observed circumstances suggested criminal activity to the officer and an immediate pursuit of the Cougar was commenced. A vehicle stop was effected a short distance away, and by radio, Swift reported his earlier observations at the darkened office site and requested a stolen vehicle check. As he approached the Cougar, Swift directed the driver to get out of the vehicle and produce his license. Sights did so and displayed a temporary California license without a photograph which gave his address as Leyden Drive in Elverta. Swift described the passenger as a bushy-haired "Mexican looking" person wearing an ankle-length gray coat.

When questioned, Sights gave several evasive answers about his activities at the parking lot, and finally admitted that he had been out of

the vehicle in the lot to "relieve himself." At that time Swift was advised by his dispatcher that the vehicle had not been reported stolen. Swift then asked Sights for evidence of vehicle ownership and registration. Unable to produce any registration, Sights was issued a citation. The officer decided to return to the office building and check for signs of entry and called for a sheriff's unit for back-up assistance. When the unit arrived, Swift described to the sheriff's deputies the chain of events leading to the vehicle stop, then returned to the office location. While Swift was checking the building, Sights permitted a search of the trunk of the Cougar, which did not reveal any contraband. Upon Swift's return, Sights and his passenger were released after having been detained less than 30 minutes.

Before he went on patrol on January 13, Sheriff Officer Briggs had been made aware of the kidnap-robbery of Michael and Librada, the robbery of the Regal service station, and the kidnap-robbery-rape of Joanne. Later that evening he was called to investigate the kidnap-robbery of John Purpur and concluded that the circumstances surrounding that crime were strikingly similar to each of the other reported crimes and that the culprits in each instance were similarly described. Briggs had been informed that after the Cougar's earlier stop, it had later been reported stolen in the kidnap-robbery-rape of Joanne W., and that Highway Patrol Officer Swift had issued a citation to the driver. Briggs surmised that by virtue of the modus operandi in each of the crimes and the description of the miscreants, the occupants of the Cougar had gone directly from the traffic detention to the Kentucky Fried Chicken where Purpur was kidnaped and robbed.

As a result of the available information obtained from each of the investigating police agencies, a surveillance was placed at the residence whose address was taken from Sights' temporary license. One member of the surveillance team reported to Briggs that two men, fitting the description of the suspects, had entered Sights' home. Briggs and Officer Neville approached the front of the house, knocked but did not announce themselves or their purpose; however, they were both in uniform. When Sights opened the door, the officers asked and were granted permission to enter. Upon entry, Sights' mother appeared and identified herself as the owner of the residence. She gave the officers permission to search the house for other suspects. That search produced Eugene Fruean, who matched the physical description of one of the suspects, and defendant Peterson, who was discovered hiding on a couch covered with a coat. Sights was asked by one of the officers if he had been earlier issued a

traffic citation by the highway patrol. When he responded affirmatively, he was placed under arrest. During the search, a long, dark overcoat was observed, and when its ownership was claimed by Eugene Fruean, he was arrested. At that time the officers did not have any information linking Peterson with any of the crimes, and he was not arrested.

Sights and Eugene Fruean were taken from the home to the county jail where they were interrogated. During the interrogation process, the sheriff's officers were informed that Peterson and Eugene's brother, the defendant Vaitafe Eti Fruean (Tuffy Fruean), were both involved in the kidnap-robberies. Briggs was advised that Tuffy Fruean was probably at his sister Gladys Coxe's residence. Upon arriving at that location, Briggs observed a 1965 light colored Chevrolet which matched the description of the vehicle used in the Duran-Valenzuela kidnap-robbery and the Regal gas station robbery. After covering units arrived and had been positioned, Briggs and Neville approached the house and knocked on the front door. Fruean's sister Gladys opened the door; she was advised they were police and were looking for Tuffy who had been implicated in a series of crimes. She allowed them to enter and search the house. That search failed to produce Tuffy or any other suspect. As the officers left, they asked Gladys to call them if Tuffy should return. Neville and Briggs returned to Sights' residence and were again admitted to the house, this time by Mrs. Sights. They advised her that Peterson had been implicated in the crimes, and she indicated his presence and he was arrested and taken into custody. In the meantime, Tuffy's sister Gladys had advised the sheriff's office that Tuffy had returned. Upon the officer's arrival, she said, " 'He is here. I called.' " Tuffy was arrested and removed to the county jail.

The only substantial question presented on this appeal concerns the legality of the vehicle stop and detention of Darwin Sights, as well as the subsequent warrantless arrests of the defendants. The trial court found the traffic stop and detention and the arrests to have been justified and refused to dismiss the information (Pen. Code, § 995) or suppress the evidence (Pen. Code, § 1538.5) procured as a result of both occurrences.

Although defendants concede the detention of one suspected of criminal activity is justified by a less demanding standard than is required to justify an arrest, they argue that the circumstances preceding the vehicle stop fall short of facts justifying a detention and investigation.

In considering the validity of the challenge to the detention, we must consider that in the course of training and in the exercise of their duties,

experienced officers develop an ability to perceive the unusual and suspicious which is of value in the performance of their task of protecting the rights and safety of law abiding citizens. Indeed the failure of an officer to investigate conduct suggestive of criminal activity based upon his expertise acquired by training and experience would constitute a breach of his obligation to properly discharge the duties of an officer of the law. (*People* v. *Gale* (1973) 9 Cal.3d 788, 797-798 [108 Cal.Rptr. 852, 511 P.2d 1204]; *People* v. *Flores* (1974) 12 Cal.3d 85, 91 [115 Cal.Rptr. 225, 524 P.2d 353].)

In *People* v. *Gale, supra,* 9 Cal.3d 788, the Supreme Court upheld the detention and arrest predicated upon facts similar to those observed by Officer Swift. There an officer on routine evening patrol observed the defendant standing in a parking lot next to a car in an area subjected to recent burglaries. The Supreme Court, in reversing the trial court's decision that the detention was illegal, held the officer's action and subsequent questioning of the defendant to be reasonable. The court indicated the following facts justified the detention, questioning, and ultimate arrest of the defendant: (1) defendant's presence in the parking lot at night; (2) the proximity of nearby businesses that had suffered recent burglaries; and (3) the defendant's false explanation for his presence. Although each fact, if considered alone, might properly be considered consistent with only innocent behavior, their cumulative effect dispels that presumption and indicates sufficiently suspicious conduct to require further investigation. (See *People* v. *Moreno* (1977) 67 Cal.App.3d 962, 969 [134 Cal.Rptr. 322].)

■ Sights was observed in a dark parking area, out of his unlighted car, in a known high crime area, and was seen running from behind the building to his car. Under the standards established in *Gale,* these facts are sufficient to justify the vehicle stop, detention, and investigation. (See also *People* v. *Mickelson* (1963) 59 Cal.2d 448, 452 [30 Cal.Rptr. 18, 380 P.2d 658].)

The defendants also contend that the warrantless arrests were unlawful. They assert a lack of probable cause, exigent circumstances, or consent to enter the residences to justify or effect the arrests.

The factual circumstances known to the officers demonstrate an articulable illustration of a situation in which a rational suspicion of criminal activity at the time of the vehicle stop, did by the assimilation of

prior information and by the accretion of subsequent information, reasonably mature into probable cause to arrest.

■ Probable cause for an arrest exists when a state of facts is presented to the officer that would lead a man of ordinary care and prudence to believe or strongly suspect that the person arrested is guilty of the offense. (See *Cunha* v. *Superior Court* (1970) 2 Cal.3d 352, 355-357 [85 Cal.Rptr. 160, 466 P.2d 704].) The information and facts acquired by each of the investigating police agencies following Sights' traffic detention, when considered as a whole, were sufficient to provide probable cause for the arrest. (See *Chimel* v. *California* (1969) 395 U.S. 752, 763 [23 L.Ed.2d 685, 694, 89 S.Ct. 2034]; *People* v. *Mickelson, supra,* 59 Cal.2d at pp. 450-451.) That evidence included the rifle found behind the darkened office building where Sights had first been observed by Officer Swift and the fact that the Cougar driven by Sights had been stolen from the kidnap-robbery-rape victim. After that information was obtained, Sights' residence was placed under surveillance. Two persons fitting the descriptions of the suspects were seen to enter the residence. The officers were then justified in attempting to apprehend the suspects. They approached the front door and knocked; Sights opened the door and observed Briggs in uniform; Briggs asked for and was given permission to enter by Sights. ■ At the time of the knock, Briggs did not identify himself as a police officer or announce his presence and purpose and demand entry as required by Penal Code section 844. However, under the circumstances, Briggs may be excused from literal compliance with that section. He was in uniform when first observed by Sights; under the circumstances, Briggs' purpose in entering the residence was known to Sights, whose conduct at the darkened office building and whose later traffic detention should make a person in his position aware that his conduct was suspect, thus rendering futile any formal advance demand for admittance. The requirements of section 844 were here met, except for an announcement by Briggs of his status and purpose. When it is reasonably apparent to the occupant of the residence to which entry is sought that the officer is present and seeking entry, announcement of purpose is satisfied under the doctrine of substantial compliance. (*People* v. *Hill* (1974) 12 Cal.3d 731, 758 [117 Cal.Rptr. 393, 528 P.2d 1].)

■ Although warrantless arrests within a dwelling are held to be unreasonable per se, they may be effected when exigent circumstances are present. (*People* v. *Ramey* (1976) 16 Cal.3d 263, 275-276 [127 Cal.Rptr. 629, 545 P.2d 1333].) Exigent circumstances exist when swift action is required to prevent imminent danger to life or property, or to

prevent the escape of a suspect or the destruction of evidence. The Supreme Court stated in *People* v. *Ramey, supra,* at page 276, "There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers." In this instance the investigating officers were aware of a series of violent and vicious crimes perpetrated against persons and property by culprits who had been described in each instance as "Mexican looking" with pulled or "oval eyes;" the modus operandi in each of the crimes was similar and the conduct of the miscreants during the kidnapings and robberies was identical. Additionally, the known factual data would reasonably indicate to the officers that the crime spree was continuing unabated and required prompt action to prevent commission of further offenses and the escape of known suspects. Under such circumstances, the Fourth Amendment of the United States Constitution does not require the officers to delay action when to do so would gravely endanger their lives or the lives of others. (*Warden* v. *Hayden* (1967) 387 U.S. 294, 298-299 [18 L.Ed.2d 782, 787-788, 87 S.Ct. 1642].) The action taken by the officers, when considered in the light of their accrued knowledge, was lawful and reasonable. Exigent circumstances for swift action were present.

The later arrest of defendants, Tuffy Fruean and Peterson, was also justified. Following the arrest of Sights and Eugene Fruean, the investigation into the crimes and the identity of the remaining suspects continued unabated. In the course of that investigation, the defendants were implicated by Sights, and the whereabouts of Tuffy Fruean were ascertained. ■ The entry into each residence for purposes of making a warrantless arrest was in each instance consensual, and consent is an exception to the warrant requirement. Under those circumstances, the necessity for exigent circumstances to justify the arrest is vitiated. (*People* v. *Rogers* (1978) 21 Cal.3d 542 [146 Cal.Rptr. 732, 579 P.2d 1048]; *People* v. *James* (1977) 19 Cal.3d 99, 106 [137 Cal.Rptr. 447, 561 P.2d 1135].) In making a determination of whether the consent was lawful, the People have the burden of proving that the manifestation of consent was a product of free will and not submission to an express or implied assertion of authority. Voluntariness of consent is in each case a question of fact to be determined in the light of the circumstances presented. (*People* v. *Reyes* (1974) 12 Cal.3d 486, 501 [116 Cal.Rptr. 217, 526 P.2d 225].) The consent for the second entry to the Sights' residence was obtained from Sights' mother, the owner of the residence. After the officers' entry, Peterson's hiding place was revealed, and he was apprehended and arrested. Tuffy Fruean attempted to conceal himself at his sister Gladys

Coxe's home and was arrested following entry by the police with her consent after she had advised the police of Tuffy Fruean's return to the residence. In each instance there is no evidence to indicate that the consent was induced by the presence of uniformed officers or that the consent would have been withheld had the occupants been advised of a right of refusal. The evidence overwhelmingly establishes the entries to be the product of voluntary consents. The trial court properly denied the defendant's motion to set aside the information and correctly refused to suppress the evidence obtained as a result of the traffic detention and the subsequent arrest of Darwin Sights.

Other contentions raised by the defendants are insubstantial and do not merit discussion in a published opinion.

The judgments of conviction are affirmed.

Paras, Acting P. J., and Reynoso, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied November 24, 1978.