[Crim. No. 33454. Second Dist., Div. Two. Oct. 17, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
PAUL FORD, Defendant and Appellant.

**COUNSEL**

Paul T. Suzuki, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Juliet H. Swoboda and Robert S. Henry, Deputy Attorneys General, for Plaintiff and Respondent.

---

**OPINION**

**ROTH, P. J.**—Appellant was convicted by a jury of the crime of rape. For purposes of our disposition, the salient facts which are not contested here are these.

Delores Riley and her friend Melody Taylor took a ride with appellant in his car in the late evening hours of November 4, 1977. When they arrived at appellant's apartment house, Ms. Riley stayed in the car and appellant and Ms. Taylor "ended up" in appellant's garage, where he threatened her with a gun[1] and had sexual intercourse with her against her will. After the two had been discovered in relative states of undress by appellant's mother, who shared the apartment, Ms. Taylor fled the premises and ultimately contacted police, advising them of what had happened and of appellant's identity and whereabouts. Upon their arrival at appellant's home, at about 2 a.m. on November 5, police officers knocked on the front door which was opened by appellant's mother in response. The officers asked if appellant was home and entered the dwelling when appellant's mother said yes and made a nodding or beckoning motion of the head, after stating, "You want to talk to him about that girl, don't you?"[2] The officers replied yes. Appellant's mother

---

[1] The weapon was a BB gun, apparently a Crossman model 454, which upon casual observance bears resemblance to a .45 automatic.

[2] Testimony by one of the arresting officers at the hearing on a motion to suppress the weapon, which was substantially repeated at trial, was that entry of the apartment was made on the following basis:

"Q. And at some point you say that she invited you into the home?

"A. That is correct.

"Q. What were her words in that regard?

"A. Her exact words—it was a combination of words and motions, nodding of the head and things of that nature. She stepped back from the door and beckoned up the staircase in a kind of a nod—well, it was a come here type thing (indicating). We did not ask entry. We were not refused entry. It was a continuing conversation. I walk [sic] talking to her at

and the officers then proceeded upstairs to appellant's bedroom, which was not lighted. Using a flashlight, the officers observed appellant lying in a bed and a weapon which resembled an automatic pistol with a long barrel (see fn. 1) on the top of a chest of drawers. When appellant stated he would get up and get dressed, the officers advised him they would wait for him outside the apartment and they withdrew with the gun. Shortly thereafter appellant appeared outside the front of his home and was arrested.

Appellant contends:

1. The gun taken from the chest of drawers should have been suppressed as the fruit of an illegal arrest.

2. The flashlight search of his bedroom was unlawful as a violation of his right to privacy.

3. The trial court should have instructed the jury on its own motion respecting testimony improperly elicited by the prosecution tending to show prior uncharged offenses.

■ Appellant relies upon *People* v. *Ramey* (1976) 16 Cal.3d 263 [127 Cal.Rptr. 629, 545 P.2d 1333] to support the contention his arrest was illegal and that, accordingly, the weapon seized from his bedroom could not be used in evidence against him. The argument, in our view, rests upon a basic misunderstanding of the rationale and proscriptions of that decision, which have no proper application to the facts present here. Thus it is clear to us the prohibition found in *Ramey* against warrantless arrests

---

the door. She stepped back from the door, still looking at me, and it was indicating again one of these nods with the head as she started up the stairs. I continued up the stairs with her, talking to her.

"Q. You asked her where Paul was and you wanted to talk to him?

"A. I asked if Paul was home and stated I wanted to talk to him.

"Q. And she indicated that he was upstairs and would get him?"

"A. No sir. She never stated she would get him.

"Q. What did she say?

"A. She yelled up the stairs, 'Paul, the police are here. They want to talk to you.'

"Q. How long after that did she proceed to ascend the stairs herself?

"A. A couple minutes.

"Q. What did you do after she began to go up the stairs?

"A. I followed her up the stairs; continued talking to her.

"Q. Is there any conversation between you and her concerning going up the stairs?

"A. No, sir.

"Q. So for you it was just a continuing conversation and movement into the house and up the stairs?

"A. Yes, sir."

in the home is predicated upon the fact of an unjustifiable *entry* into the home, which then provides the opportunity to arrest. Stated otherwise it is the unlawful *intrusion* into the dwelling which offends constitutional safeguards and which is therefore at the heart of the matter, rather than the arrest itself. Conversely, when no such illegal entry has occurred the fact an accused is arrested in his home is in itself of no greater significance than if he were arrested elsewhere.[3]

Here police officers proceeded to appellant's apartment after being advised he was the perpetrator of a rape. Their entry into the home was validly based upon consent (*People* v. *Ramey* (1976) *supra,* 16 Cal.3d 263), albeit the consent of appellant's mother. (*People* v. *Daniels* (1971) 16 Cal.App.3d 36 [93 Cal.Rptr. 628].) When they proceeded to appellant's bedroom a weapon like that used in the commission of the reported crime was discovered in plain sight. In an attempt at caution they requested appellant to step outside where his arrest was effected.[4] Under these circumstances, the suggestion by appellant his rights were invaded in our opinion is not well taken.

The result is the same respecting his contention his right of privacy was abridged by the claimed search and seizure engaged in by the police. (*Katz* v. *United States* (1967) 389 U.S. 347 [19 L.Ed.2d 576, 88 S.Ct. 507].) The fact is the investigating officers were justifiably present as the result of the consent of appellant's mother. (*People* v. *Daniels, supra,* 16 Cal.App.3d 36.) The further circumstance that a flashlight was used by them to illuminate the darkened bedroom and thus to disclose the weapon otherwise unhidden, so far as we are concerned, does not change their lawful presence into an illegal intrusion nor the seizure of the weapon into an unlawful act. (See *People* v. *Benedict* (1969) 2 Cal.App.3d 400, 403 [82 Cal.Rptr. 759].)

---

[3]As pointed out earlier, appellant was not *formally* arrested within the apartment. Our analysis respecting *Ramey* nevertheless finds applicability on the basis of *a fortiori* considerations.

[4]When asked why appellant was requested to come outside to talk, one of the officers candidly conceded:

"A. Because of Remey [*sic*] and things—not wanting—the going into the house for that purpose.

"Q. To put it frankly you felt the arrest might be imminent and you preferred to have him outside to avoid any possible future Remey [*sic*] problems?

"A. That's correct. After finding the weapon that's what I believed."

The procedure, however misconceived and however unavailing in other circumstances, has no bearing on our conclusion based on the facts at bench.

■ Finally, appellant urges evidence was improperly received and an instruction should have been provided by the trial court *sua sponte* respecting prior uncharged offenses disclosed in testimony elicited from him by the prosecution. Our review of the record in this regard persuades us the claim is not well taken. Thus it is clear appellant sought to impeach the credibility of his alleged victim by a showing she could at other times have observed the gun assertedly used to threaten her, since as appellant testified it was "common knowledge" in his neighborhood that he owned it, and that it was displayed by him "many times" in public. On cross-examination, the prosecution posed questions calculated to: (a) show there was no such common knowledge because appellant kept the gun concealed when possessing it in public; (b) establish whether, if seen by others, the gun appeared to be a more dangerous weapon than it was; (c) capitalize upon appellant's voluntary statement on cross examination he had some two years previously been sought out and shot by a CYA escapee and had used the weapon to extricate himself from the confrontation.

In each instance the responses sought by the prosecution were germane to basic elements of the case against appellant which were necessary to be established or rebutted and the questions posed were occasioned solely because of information first volunteered by appellant. Under such circumstances it cannot reasonably be maintained the testimony elicited was improperly before the jury. When coupled with the further facts that no objection was made to the prosecution's questions (see *People* v. *Welch* (1972) 8 Cal.3d 106, 114-115 [104 Cal.Rptr. 217, 501 P.2d 225]) and that no limiting instruction was requested (Evid. Code, § 355) it is clear no error occurred. (See *People* v. *Richards* (1976) 17 Cal.3d 614, 618-619 [131 Cal.Rptr. 537, 552 P.2d 97].)

The judgment is affirmed.

Compton, J., and Beach, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied December 13, 1979.