[Crim. Nos. 10749, 10801. Third Dist. Mar. 19, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES THOMAS McCARTER et al., Defendants and Appellants.

COUNSEL

Richard Keith Corbin and Kenneth R. O'Brien, under appointments by the Court of Appeal, for Defendants and Appellants.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Eddie T. Keller and W. Scott Thorpe, Deputy Attorneys General, for Plaintiff and Respondent.

Opinion

**PUGLIA, P. J.**—After motions to suppress evidence were denied, defendants James Thomas McCarter and Marvin Dean Noor entered negotiated pleas of guilty to first degree murder (Pen. Code, §§ 187, 189). In consolidated appeals, defendants attack only the denial of their motions to suppress (Pen. Code § 1538.5, subd. (m)). Issues raised on appeal relate to the validity and manner of execution of two search warrants, the validity of the warrantless arrests of McCarter and Dani Shope (an accomplice), and the admissibility of statements made by Shope, Noor and McCarter. We shall affirm.

### The Search Warrants

The contested search warrants were based on the following sworn information:

Between 10:30 and 11:30 p.m. on January 13, 1979, Jimmy Lee Campbell, a black, was shot and killed by what appeared to be a large caliber weapon. His body, a bullet wound in the shoulder, was found in Chico between a city street and nearby railroad tracks.

At about 2:20 p.m. on January 14, 1979, Police Officer Bragdon received a telephone call from a woman identified as Linda. Linda stated that she lived in an Oroville apartment adjoining one occupied by a woman named Paula and the brother of Noor. Sometime between 11 p.m., January 13 and 2 a.m., January 14, Noor and Shope came to Paula's apartment. Linda overheard their conversation through the wall. Linda heard Noor and Shope brag to Paula about killing "niggers," specifically, a black male and female;[1] while driving on a Chico street, Noor and Shope had pulled up beside a black male and shot him; Shope expressed satisfaction in seeing both shootings and said it would be her turn next. Linda told Officer Bragdon the full names of Shope and Noor, their physical descriptions, and the color and shape of their vehicle. Linda said that Shope and Noor lived together in apartment 2 at a new apartment building on Nelson Avenue in Oroville. She described another male who had been with Shope and Noor during the evening of the shooting but she did not know his name or address.

---

[1]Defendants were later charged with the attempted murder of a black female but that charge was dropped following the negotiated pleas of guilty to the first degree murder of Jimmy Campbell.

Linda also stated that the weapon used in the shootings belonged to Noor's mother, who lived on Southview Drive in Oroville.

Prior to calling Officer Bragdon, Linda had heard a news report that a man had been shot along a road in Chico. However, the news report did not include the race of the victim nor mention a female victim.

After Linda finished talking on the telephone, Paula talked to Officer Bragdon. She identified herself by her first name and said her boyfriend David worked at the A & A Body Shop in Oroville and was Noor's brother. On January 13, Noor had come to the body shop and Paula had heard him ask David to go with him to his mother's house to get a .30-.30 Winchester rifle so Noor could go "hunting." Later that evening, Paula saw Shope and Noor with another male. At about 12:30 a.m. on January 14, Noor and Shope came to her apartment. They bragged to her and David about having killed "niggers." Shope said, "It's my turn now. I'm going to go get one." Noor had a rifle with him. Paula believed that Noor took the rifle back to his mother's house at 33 Southview Drive in Oroville later that morning. His mother's name was Micki Croft. Paula provided Officer Bragdon with a description of Noor's vehicle, told him how to get to Shope's apartment on Nelson Avenue, and indicated that Noor previously had been in jail and on probation. She also provided Officer Bragdon with a telephone number where Linda could be contacted.

In corroboration of the information supplied by Linda and Paula, police officers contacted Linda by telephone, confirmed that the news reports had not mentioned that the homicide victim was a black adult male, and discovered that Noor had a prior arrest and that a traffic collision report listed him as living at 33 Southview Drive, Oroville, and listed Shope as a witness living at 425 Nelson Avenue, Apartment 2, Oroville. The officers then found the 33 Southview address, a mailbox bearing Shope's name at 425 Nelson Avenue, and a vehicle (California license AUR 858) parked at the Nelson Avenue apartment which matched the description given by Linda and Paula.

In further corroboration, police officers were contacted at about 5:40 p.m. on January 14 by a sheriff's officer, who had received a call from a male citizen informant identified by name, address, and telephone number. The citizen informant had said that a close friend of his had been with Noor the night before and that Noor had boasted to the friend of driving with Shope in Chico and shooting a hitchhiking black

male in the shoulder with a .30-.30 rifle; the victim ran to some railroad tracks and fell to the ground. He also boasted of later killing a black female in Oroville. At about 6:20 p.m., police officers received a followup call from the same citizen informant, who gave confirmatory information regarding the description of Noor's vehicle and the ownership of the murder weapon by Noor's mother. He also said Noor lived on Nelson Avenue.

Based on the foregoing information, the magistrate found probable cause to support the issuance of search warrants (1) for the apartment of Dani Shope at 425 Nelson Avenue, Oroville, and a 1961 Pontiac, and (2) for the residence of Noor's mother at 33 Southview Drive, Oroville. The warrants authorized the officers to search for any pistol, revolver, or rifle larger than .22 caliber, any ammunition or spent shell casing larger than .22 caliber, and any documents which would establish that Noor or Shope were in the Chico area on January 13, 1979. The magistrate authorized service at any time of day or night because of the fact "that it's now approximately 9:20 PM." He signed the warrants at about 9:30 p.m.

Both defendants contend that the search warrants are invalid because no probable cause existed for their issuance. ■ On appeal defendants have the burden of establishing that the magistrate's finding of probable cause is unsupported by competent evidence as a matter of law. (*Theodor* v. *Superior Court* (1972) 8 Cal.3d 77, 101 [104 Cal.Rptr. 226, 501 P.2d 234]; *Skelton* v. *Superior Court* (1969) 1 Cal.3d 144, 150 [81 Cal.Rptr. 613, 460 P.2d 485].) Here, we find ample information in the sworn affidavit in support of the search warrants to meet the test of substantial probability that the murder weapon and/or ammunition would be located in Noor's vehicle used during the shooting, in the apartment where Noor lived, or in his mother's house where Noor obtained the murder weapon. (*People* v. *Cook* (1978) 22 Cal.3d 67, 84, fn. 6 [148 Cal.Rptr. 605, 583 P.2d 130].)[2]

■ Nevertheless, defendants insist the "untested" hearsay information given by the two "unidentified" female informants who telephoned

---

[2]We do not reach the question of probable cause to search for documents establishing that Noor or Shope were in the Chico area on January 14, since no documents were ever seized. Any lack of probable cause therefor does not affect the validity of the remaining portions of the warrants. (*People* v. *Howard* (1976) 55 Cal.App.3d 373, 379 [127 Cal.Rptr. 557]; *Aday* v. *Superior Court* (1961) 55 Cal.2d 789, 797 [13 Cal.Rptr. 415, 362 P.2d 47].)

the police is not competent evidence under the two-prong test of *Aguilar* v. *Texas* (1964) 378 U.S. 108, 114-115 [12 L.Ed.2d 723, 728-729, 84 S.Ct. 1509]. The two requirements of *Aguilar* are: "(1) the affidavit must allege the informant's statement in language that is factual rather than conclusionary and must establish that the informant spoke with personal knowledge of the matters contained in such statement; and (2) the affidavit must contain some underlying factual information from which the magistrate issuing the warrant can reasonably conclude that the informant was credible or his information reliable." (*People* v. *Smith* (1976) 17 Cal.3d 845, 850 [132 Cal.Rptr. 397, 553 P.2d 557].)

■ The first prong of the *Aguilar* test obviously is satisfied here. Each of the female informants, whose tape-recorded statements were heard by the magistrate, personally heard Noor's and Shope's statements "against penal interest" (Evid. Code, § 1230; *People* v. *Mardian* (1975) 47 Cal.App.3d 16, 31 [121 Cal.Rptr. 269]) and each observed Noor's and Shope's conduct and appearance. Although neither knew exactly where the murder weapon was, each detailed what she knew of her own knowledge with respect to the whereabouts and appearance of the murder weapon.

As to the second prong of *Aguilar*, we are satisfied that the affiant supplied sufficient corroborative factual information from which the magistrate could reasonably conclude that the female informants were credible and their information reliable. The officers corroborated the information given by the female informants by establishing who lived at the residences to be searched and by locating the described vehicle at Shope's apartment. In particular, they had independent information as to a crime detail not reported by the news media, i.e., that the murder victim was black. (*People* v. *Fein* (1971) 4 Cal.3d 747, 752-753 [94 Cal.Rptr. 607, 484 P.2d 583]; *People* v. *Magana* (1979) 95 Cal.App.3d 453, 463 [157 Cal.Rptr. 173].) While Linda and Paula did not disclose their full identity to the police, they were not completely anonymous. They provided a telephone number where Linda could be reached and the police recontacted Linda to establish its accuracy. Paula also disclosed the place where her living partner, Noor's brother, worked. Furthermore, another fully identified citizen informant independently told the officer, at a different time and place, that Noor had claimed shooting a black male and female with a .30-.30 rifle belonging to Noor's mother. This independent informant also described Noor's vehicle and present address and knew in particular that the male victim had been shot in the shoulder by a railroad track in Chico. (See *People* v.

*Balassy* (1973) 30 Cal.App.3d 614, 621 [106 Cal.Rptr. 461]; *Clifton* v. *Superior Court* (1970) 7 Cal.App.3d 245, 253-254 [86 Cal.Rptr. 612]; *People* v. *Sheridan* (1969) 2 Cal.App.3d 483, 488-489 [82 Cal.Rptr. 695].) While this third informant's statements were double hearsay, the requisite showing of reliability in the case of a citizen informant is significantly less than that demanded of a police informant. (*People* v. *Ramey* (1976) 16 Cal.3d 263, 268-269 [127 Cal.Rptr. 629, 545 P.2d 1333].) We thus reject defendants' contention of lack of competent evidence to establish probable cause for the search warrants. "[P]robable cause, not certainty, is the cornerstone of the warrant-issuing process." (*Theodor* v. *Superior Court, supra*, 8 Cal.3d at p. 96.)

### Execution of the Search Warrants and Arrests of Shope, Noor, and McCarter

After the magistrate signed the search warrants, police officers invited him to ride in one of the police vehicles, as an observer, during the execution of the warrants. The magistrate accepted in order to broaden his experience in criminal procedure, a subject he taught at a community college. The officers advised the magistrate not to participate in any of their activities and he neither assisted nor gave any legal opinion to the officers during the execution of the search warrants and the subsequent arrests.

The police served the first search warrant on the Nelson Avenue apartment at 9:46 p.m. Officers Bragdon and Horton stood on each side of the door while Officer Suniga knocked. A female voice responded, "Who is it?" Animated by concern for his personal safety, Suniga said, "Mike." When the female said she did not know a Mike, Suniga answered he was her neighbor. Obtaining no further response, Suniga announced that he was a police officer, had a search warrant, and wanted her to open the door. Hearing body movement and knowing the female was located directly on the other side of the door, Suniga kicked open the door after waiting about 20 to 30 seconds.

Upon entering the apartment, the officers immediately found Shope. They found Noor in a bedroom. Both were arrested. Having been advised of and having waived her *Miranda* rights, Shope told the officers that the murder weapon was at the Southview residence. Noor was questioned later.

The officers completed the search of the Nelson Avenue apartment and the vehicle described in the warrant at 10:15 p.m. The only item seized was a ".33" caliber shell found on the front passenger seat of the vehicle.

The officers then proceeded to the Southview Drive residence described in the second warrant. This second search commenced at 10:41 p.m. and ended at 10:55 p.m. The officers there seized a .30-.30 Winchester rifle and four .30-.30 super shells.

During this second search, Officer Horton questioned Shope at the police department. Originally Shope said that Noor shot Jimmy Campbell, but later changed her story and said McCarter was the one who actually shot him; she supplied McCarter's address and description. Based on Shope's statement as well as the earlier information of the possibility of future killings, Horton radioed the officers at the Southview residence and instructed them to arrest McCarter at his residence.

The police arrived at McCarter's residence at approximately 11 p.m. Officers Bragdon and Suniga knocked at the front door. McCarter moved the shade, observed the officers, and opened the door. Bragdon and Suniga then placed McCarter under arrest.

After waiving her *Miranda* rights, Shope gave three statements to the police. The first two were made before McCarter's arrest. At about 11:50 p.m. on January 14 McCarter waived his *Miranda* rights and talked to the police. Noor likewise waived his rights at about 12:10 a.m. on January 15, and gave a statement. At approximately 1 a.m. Noor asked to speak to the officers again and said that he had lied during the initial interview. McCarter, Noor, and Shope were arraigned at about 3:30 p.m. on January 16, 1979.

I

Relying on *Lo-Ji Sales, Inc.* v. *New York* (1979) 442 U.S. 319 [60 L.Ed.2d 920, 99 S.Ct. 2319], defendants claim that the search warrants were illegal because the issuing magistrate was not neutral and detached. Defendants focus primarily on the magistrate's activities subsequent to the signing of the warrants. We reject such claim.

It is well established that a warrant must be authorized by a neutral and detached judicial officer rather than a law enforcement officer

"engaged in the often competitive enterprise of ferreting out crime." (*Johnson* v. *United States* (1948) 333 U.S. 10, 14 [92 L.Ed. 436, 440, 68 S.Ct. 367]; *Lo-Ji, supra*, 442 U.S. at p. 326 [60 L.Ed.2d at p. 928].) However, the relevant time for making such a determination is when the magistrate reviews the evidence supporting probable cause and issues a search warrant. Here, the magistrate's mere observation post issuance of the officers' execution of the search warrants does not reflect upon his neutrality at the time of issuing them.

In *Lo-Ji*, the United States Supreme Court held that a judicial officer was not neutral and detached when he issued an *open-ended* warrant to search for obscene materials in an "adult" bookstore and then proceeded to accompany officers to the bookstore in order independently to determine and direct what additional items were obscene and should be seized. In other words, the judicial officer ". . . allowed himself to become a member, if not the leader, of the search party which was essentially a police operation. Once in the store, he conducted a generalized search under authority of an invalid warrant; he was not acting as a judicial officer but as an adjunct law enforcement officer." (*Lo-Ji, supra*, 442 U.S. at p. 327 [60 L.Ed.2d at p. 929].)

Those circumstances are not present here; these warrants were valid and the magistrate took no part in their service or execution. Moreover, *Lo-Ji* involved items (books, films, etc.) which are presumptively protected by the First Amendment. (*Id.*, 442 U.S. at p. 328 [60 L.Ed.2d at p. 929]; cf., *Heller* v. *New York* (1973) 413 U.S. 483 [37 L.Ed.2d 745, 93 S.Ct. 2789]; *People* v. *Superior Court (Meyers)* (1979) 25 Cal.3d 67, 77-78 [157 Cal.Rptr. 716, 598 P.2d 877].)

The remaining contentions on appeal are made by defendant McCarter alone.

## II

■ McCarter asserts that the warrant for the Nelson Avenue apartment was improperly executed because the officers broke open the door without first giving proper notice of their authority and purpose. We disagree.

Penal Code section 1531 provides: "The officer may break open any outer or inner door or window of a house, or any part of a house, or

anything therein, to execute the warrant, if, after notice of his authority and purpose, he is refused admittance."

The officers complied with section 1531 by giving notice of their authority and purpose. The occupants' 30-second delay in responding although she was directly opposite the door constituted refused admittance which justified the forced entry. (*People* v. *Peterson* (1973) 9 Cal.3d 717, 723, fn. 8 [108 Cal.Rptr. 835, 511 P.2d 1187] [about 1 minute]; *People* v. *Elder* (1976) 63 Cal.App.3d 731, 739 [134 Cal.Rptr. 212] [about 20 seconds].)

The unsuccessful "ruse" initially employed to gain entry did not vitiate justification for the forced entry. Employment of a ruse to obtain consent to enter is immaterial where officers have a right to enter and search without permission pursuant to a valid search warrant. (*People* v. *Superior Court* (*Proctor*) (1970) 5 Cal.App.3d 109, 114 [84 Cal.Rptr. 778]; *People* v. *Rudin* (1978) 77 Cal.App.3d 139, 142 [143 Cal.Rptr. 360]; *People* v. *Thompson* (1979) 89 Cal.App.3d 425, 431-432 [152 Cal.Rptr. 495]; *People* v. *Patterson* (1979) 94 Cal.App. 3d 456, 461 [156 Cal.Rptr. 518].) In any event, the ruse did not work, and the officers announced their identity and purpose in compliance with section 1531. The search warrant for the Nelson Avenue apartment was properly executed.

## III

McCarter challenges the post-10 p.m. execution of the second search warrant at the Southview Drive apartment. He contends that the magistrate abused discretion in authorizing nighttime search solely on the ground that the warrants were not issued until 9:20 p.m.

Penal Code section 1533 provides: "Upon a showing of good cause, the magistrate may, in his discretion, insert a direction in a search warrant that it may be served at any time of day or night. In the absence of such a direction, the warrant shall be served only between the hours of 7 o'clock a.m. and 10 o'clock p.m."

A magistrate's finding of reasonable necessity for nighttime service pursuant to section 1533 will not be disturbed on appeal absent an abuse of discretion. If an affidavit, read in a common sense manner and as a whole, reasonably supports the inference that the interests of justice are best served by the authorization of nighttime service, provision

for such service in a warrant is proper. (*People* v. *Mardian, supra,* 47 Cal.App.3d at p. 35; *In re Donald R.* (1978) 85 Cal.App.3d 23, 26 [149 Cal.Rptr. 152].) Section 1533 does not require a separate sworn statement of good cause for a nighttime search. (*Mardian, supra,* 47 Cal. App.3d at p. 35; *In re Donald R., supra,* 85 Cal.App.3d at p. 26; see also *People* v. *Zepeda* (1980) 102 Cal.App.3d 1, 6-7 [162 Cal.Rptr. 143]; *Solis* v. *Superior Court* (1966) 63 Cal.2d 774, 776-777 [48 Cal. Rptr. 169, 408 P.2d 945].)

Here, the magistrate expressly stated that the justification for nighttime service was the late hour of issuing the warrants. Immediate searches of the two residences obviously were contemplated. Just as obviously, the officers could not reasonably be expected to complete both before the hour of 10 p.m. (See *People* v. *Zepeda, supra,* 102 Cal.App. 3d at p. 6.) Examination of the supporting affidavit also discloses factors justifying immediate search rather than postponement until the following day. As the affidavit showed, officers had just received information leading them to believe that one or more racially motivated, senseless murders had occurred the previous night and that another was contemplated. In addition, informant Paula, who lived with the brother of defendant Noor, was concerned for her own safety. Thus, in the interests of justice and public safety, there was justification expeditiously to pursue the investigation and if possible avert any more killings. The indorsement of the warrants for night service was well within the discretion of the issuing magistrate.

## IV

McCarter next contends that the warrantless arrest of Shope inside her home was illegal under *People* v. *Ramey, supra,* 16 Cal.3d 263, and *Payton* v. *New York* (1980) 445 U.S. 573 [63 L.Ed.2d 639, 100 S.Ct. 1371]. This contention fails.

First, McCarter did not challenge the arrest of Shope in the trial court on the ground of a *Ramey* violation; there, he restricted *Ramey* objections to his own warrantless arrest. ■ McCarter's failure to object to Shope's arrest on *Ramey* grounds waives consideration of the issue for the first time on appeal. (*In re Joe R.* (1980) 27 Cal.3d 496, 510 [165 Cal.Rptr. 837, 612 P.2d 927]; *People* v. *Gunnerson* (1977) 74 Cal.App.3d 370, 382 [141 Cal.Rptr. 488].)

■ Second, no *Ramey* violation as to Shope could have occurred under the present facts since the police had judicial authorization to enter her home via a validly issued and executed search warrant. "[I]t is the intrusion into, rather than the arrest in, the dwelling which offends constitutional standards under *Ramey*." (*People v. Evans* (1980) 108 Cal.App.3d 193, 196 [166 Cal.Rptr. 315]; see also *People v. Ford* (1979) 97 Cal.App.3d 744, 748-749 [158 Cal.Rptr. 859].) Given probable cause to arrest the existence of which is not challenged here, an officer may make an arrest outside the home without judicial authorization. If officers have authorization to enter the home, an arrest inside is of no greater constitutional significance than an arrest elsewhere. (*People v. Ford, supra*, at p. 748.)

## V

McCarter contends that his own warrantless arrest in his home was illegal under *Ramey*; he does not contest the existence of probable cause for the arrest. We conclude that exigent circumstances, as defined in *Ramey*, justified the police action and rendered the arrest valid.

■ In the context of a warrantless arrest in the home, "'exigent circumstances' means an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence. There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers." (*Ramey, supra*, 16 Cal.3d at p. 276.)

In the present case, the arresting officers knew a racially motivated murder had occurred in Chico the night before and that another murder could have occurred in Oroville. Because of Shope's statement indicating "her turn" was next, the officers also could reasonably have believed that the senseless shootings would continue. Only shortly before McCarter's arrest did the police learn from Shope McCarter's identity and address and the probability he had been the "trigger" man in the Chico murder. They faced an emergency situation where delay to obtain a warrant might have endangered the lives of other innocent victims in the community. (See *People v. Peterson* (1978) 85 Cal.App.3d 163, 171 [149 Cal.Rptr. 198]; *People v. Superior Court (Dai-re)* (1980) 104 Cal.App.3d 86, 90 [163 Cal.Rptr. 417].) Moreover, McCarter's accomplices, who had already been arrested could have warned him by

telephone (see *People* v. *Szabo* (1980) 107 Cal.App.3d 419, 433 [165 Cal.Rptr. 719]), and the officers could well have believed McCarter's escape was imminent. Thus, exigent circumstances justifying an immediate warrantless arrest were present.

McCarter, however, argues that the presence of the magistrate at the scene of his arrest necessarily relieved the exigency which would otherwise have excused the need for a warrant. He asserts that the officers readily could have obtained an arrest warrant from the magistrate by means of an oral declaration.

Unlike provisions permitting the issuance of a search warrant on the basis of sworn oral statements which are recorded (Pen. Code, § 1526, subd. (b)), arrest warrants must be accompanied by sworn written complaints or affidavits stating probable cause (Pen. Code, §§ 813, 814, 815). There is no authority for a magistrate to issue an arrest warrant on the basis of oral testimony.

## VI

·McCarter finally claims that statements made by Shope, Noor, and himself during custodial police interrogation were inadmissible per se because the officers unnecessarily delayed bringing them before a magistrate (Pen. Code, §§ 825, 849) and because the magistrate who was present during the investigation neither advised them of their constitutional rights nor appointed counsel. The latter portion of this two part contention is adequately answered, adversely to defendant, by the discussion in *Stanley* v. *Justice Court* (1976) 55 Cal.App.3d 244, 252-254 [127 Cal.Rptr. 532]. For present purposes we shall assume the foregoing contention is cognizable in an appeal from a denial of a statutory suppression motion; we shall also assume McCarter has standing to raise the issue of admissibility of statements of Noor and Shope.

Assuming, arguendo, noncompliance with Penal Code sections 849, 810, or 859, there is nothing in the record suggesting the statements by Shope, Noor, and McCarter were not admissible under California law. The *McNabb-Mallory* rule of federal criminal procedure, that a defendant's statement is ipso facto inadmissible if made during a period of illegal detention is not followed in California. (*Rogers* v. *Superior Court* (1955) 46 Cal.2d 3, 9-11 [291 P.2d 929]; *People* v. *Haydel* (1974) 12 Cal.3d 190, 199 [115 Cal.Rptr. 394, 524 P.2d 866]; *People* v. *Pettingill* (1978) 21 Cal.3d 231, 244 [145 Cal.Rptr. 861, 578 P.2d

108]; *In re Michael E.* (1980) 112 Cal.App.3d 74, 79 [169 Cal.Rptr. 62].) California distinguishes between an unlawful arrest and a delay in arraignment following a lawful arrest. (See *People* v. *DeVaughn* (1977) 18 Cal.3d 889, 895-897 [135 Cal.Rptr. 786, 558 P.2d 872]; *People* v. *Pettingill, supra,* 21 Cal.3d at p. 244.) In the latter situation, illegal detention is only one factor to be considered in determining voluntariness (*People* v. *Harris* (1981) 28 Cal.3d 935, 953-954 [171 Cal.Rptr. 679, 623 P.2d 240]; *Rogers* v. *Superior Court, supra,* 46 Cal.2d at p. 10). Since we have affirmed the legality of the arrests of all three suspects and defendant does not claim involuntariness of the challenged statements, the exclusionary rule is inapplicable here.

The judgments are affirmed.

Regan, J., and Blease, J., concurred.

A petition for a rehearing was denied April 15, 1981, and appellants' petitions for a hearing by the Supreme Court were denied June 17, 1981.