[Crim. No. 37448. Second Dist., Div. One. May 27, 1981.]

In re DANNY E., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
DANNY E., Defendant and Appellant.

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and William T. Harter, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Shunji Asari and Thomas L. Willhite, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**SPENCER, P. J.—**

### INTRODUCTION

Danny E. was declared a ward of the court (Welf. & Inst. Code, § 602) upon the finding that he had participated in a voluntary man-

slaughter (Pen. Code, § 192, subd. 1) in which a firearm had been used (Pen. Code, § 12022, subd. (a)) after which he was committed to the California Youth Authority. He appeals the order of wardship and commitment.

STATEMENT OF FACTS[1]

At approximately midnight on October 31, 1979, Abraham Gonzales and a group of his friends were walking on Hoefner Avenue in East Los Angeles when they were attacked by members of a rival gang, the VNE. The attackers had arrived in a certain 1964 Chevrolet that was later abandoned at the scene. They utilized tire irons, jacks and a rifle in the course of the assault. With the latter weapon Gonzales was fatally shot in the face while another youth was seriously wounded in the leg.

Officers investigating the incident were advised by witnesses that certain members of the attacking group also had beaten a friend of Gonzales, one "Chito," some 15 minutes earlier at a Halloween party being held at a nearby residence. These witnesses informed the officers that appellant had participated in Chito's beating and might be the owner of the Chevrolet. However, they further advised that they believed someone other than appellant had been driving the car prior to the homicidal attack on Gonzales and that they had not seen appellant among Gonzales' assailants. A check of the automobile's registration revealed that it was not registered to appellant but to a party named Munoz in the Monterey Park area.

Some five days later, still having no probable cause to arrest appellant, and not intending to do so, Deputy Sheriff William Wilson and his partner called at the home of appellant's mother at approximately 2 p.m. in the afternoon to inquire about appellant's possible knowledge of the homicide. Appellant's sister responded to the officer's knock and called appellant to the door when informed the officer wished to speak with him. Then, Officer Wilson testified, "I told Danny that we'd like to talk to him. He opened the screen door and stepped outside. We started to talk right there, but there were a number of children back in that area, so we asked him if we could step in front of the house and speak with him there."

---

[1]We view the evidence in the light most favorable to the order admitting appellant's statements. (*People* v. *Randall* (1970) 1 Cal.3d 984, 954 [83 Cal.Rptr. 658, 464 P.2d 114]; *People* v. *James* (1977) 19 Cal.3d 99, 107 [137 Cal.Rptr. 447, 561 P.2d 1135].)

Standing in the front yard of his residence, appellant told Officer Wilson that the 1964 Chevrolet belonged to his mother but that he had been driving it on Halloween. "He said that sometime between 8:00 o'clock and 9:00 o'clock on the 31st, while they were trick or treating on Hoefner Street, the vehicle ran out of gas, that he left the vehicle sit on Hoefner Street, and that they had all left that location and walked back to his home, and that he had remained at his home the rest of the night."

Prior to this conversation, Officer Wilson had not advised appellant of his constitutional rights because he had not regarded him as a true suspect. However, when appellant admitted an involvement with the automobile but denied having been present at a party where others had seen him, the officers asked if he would voluntarily accompany them to the police station for a further interview. He agreed to do so. Officer Wilson then spoke to appellant's mother to inform her that appellant was accompanying them and to ask her if she, too, would come to the station to talk with them. She also agreed.[2]

After first interviewing appellant's mother while appellant waited some 30 minutes to an hour in an interview room, and finding that she continued to confirm appellant's version of the night in question, Officer Wilson spoke again with appellant. He explained the discrepancy in appellant's story that he wished to resolve and then carefully advised appellant of each of his constitutional rights in accordance with the requirements of *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. Appellant agreed to discuss the matter. Thereafter, he admitted having participated in both assaults but denied that he had been the party who had shot and killed Gonzales.

CONTENTS

I

Appellant contends that all of his statements to the deputy sheriffs should have been excluded in that he was not given *Miranda* warnings prior to being questioned at his home.

---

[2]The testimony of appellant, his sister and his mother was essentially consistent with, and corroborative of, that given by Officer Wilson, although they at times indicated that, at the mother's invitation, the officer had actually stepped inside the front door of the residence while he waited for appellant to respond to her call. They agreed, however, that thereafter appellant had stepped outside to talk with the officers privately

## II

Appellant further asserts that his confession should have been suppressed as the product of an illegal arrest.

## DISCUSSION

■ Appellant's contention that his statements in response to questioning at his home should have been excluded in that he was not given *Miranda* warnings is without merit. As the authors of *Miranda* v. *Arizona, supra,* were at pains to point out at pages 477-478 [16 L.Ed.2d at pp. 725-726]: "Our decision is not intended to hamper the traditional function of police officers in investigating crime. . . . Such investigation may include inquiry of persons not under restraint. General on-the- scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present."

Before proceeding further with our analysis, it must be stressed that contrary to the premise underlying all of appellant's arguments on appeal, there is nothing in the record to compel the conclusion that appellant was subjected to a "detention" before his conversation with the police at his home. "There can be no doubt that a police officer in the performance of his duties shares the right of all persons to address another on the public streets, or at least that there is no constitutional proscription of his so doing. 'There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets.' (*Terry* v. *Ohio*, 392 U.S. 1, 34 . . . conc. opn. of Mr. Justice White.) And so long as his conduct does not constitute a 'detention,' a police officer may talk to anyone in a public place, 'something that any person would lawfully be permitted to do, or try to do.' (*People* v. *Larkin*, 52 Cal.App.3d 346, 349 . . . .) Unless there is some sort of a temporary restraint or holding in custody, there is no detention. [Citations.]" (*People* v. *King* (1977) 72 Cal.App.3d 346, 349 [139 Cal.Rptr. 926].)

---

when asked to do so. Appellant further confirmed the officer's testimony concerning the content of this initial conversation. He asserted, however, that he had then been told he was under arrest and advised of his constitutional rights before being taken to the police station.

Nonetheless, even if it rationally could be argued that the officers' action in requesting to speak with appellant in private on his own front lawn constituted an "assertion of authority," or "detention," it would have been appropriate for the trial court to conclude that *Miranda* warnings were not required at that juncture. "When an arrest has not yet taken place, the factors considered in deciding whether custody has attached are many. Among the most important are: (1) the site of the interrogation; (2) whether the investigation has focused on the suspect; (3) whether the objective indicia of arrest are present; and (4) the length and form of the questioning." (*People* v. *Herdan* (1974) 42 Cal.App.3d 300, 306-307, fns. omitted [116 Cal.Rptr. 641]; *People* v. *Blouin* (1978) 80 Cal.App.3d 269, 282-283 [145 Cal.Rptr. 701].)

Here the questioning took place at appellant's own home; no objective indicia of arrest or detention were apparent, and the questioning was brief and nonaccusatorial. With respect to "focus," although the officers knew that appellant, a gang member, had reportedly participated in a fight earlier on the evening of the homicide, and might be the owner of the 1964 Chevrolet, they had also learned that his presence had not been observed by witnesses at the time of the killing and the Chevrolet was, in fact, not registered to him. The police did no more than give appellant the opportunity to explain away suspicious circumstances and, hopefully, to cooperate with them in their efforts to apprehend the true culprits.

As our Supreme Court noted in *In re Tony C.* (1978) 21 Cal.3d 888, 894 [148 Cal.Rptr. 366, 582 P.2d 957]: "Indeed, the principal function of [police] investigation is to resolve ... ambiguity and establish whether the activity is in fact legal or illegal—to 'enable the police to quickly determine whether they should allow the suspect to go about his business or hold him to answer charges.' (*People* v. *Manis* (1969) *supra*, 268 Cal.App.2d 653, 665 [74 Cal.Rptr. 423].) ..." It was only after appellant had denied his presence at the time Chito was beaten, but admitted indirect ownership of an automobile used in connection with the later homicide that the police became truly suspicious of him. Thereafter, they made no further inquiries until (1) he and his mother had agreed to accompany them to the station for formal questioning, and (2) they had fully explained his constitutional rights to him.

■ Appellant's second contention that his confession was the product of an illegal arrest is equally meritless. Initially we must emphasize that our Supreme Court's holding in *People* v. *Ramey* (1976)

16 Cal.3d 263, 275-276 [127 Cal.Rptr. 629, 545 P.2d 1333], or the United States Supreme Court's decisions in *Payton* v. *New York* (1980) 445 U.S. 573 [63 L.Ed.2d 639, 100 S.Ct. 1371] and *Steagald* v. *United States* (1981) 451 U.S. 204 [68 L.Ed.2d 38, 101 S.Ct. 1642] have no direct relevance here in that (1) the police did not have probable cause to arrest appellant when they went to his mother's home nor was it their intention to do so, and (2) any police contact with appellant of which he might possibly complain occurred outside his residence.

As to the second element, while it has been held that ordinarily *a ruse* may not be used to gain *entry into* a home to effect an arrest without compliance with *Ramey's* requirements (*People* v. *Superior Court* (*Godwin*) (1977) 68 Cal.App.3d 780 [137 Cal.Rptr. 586]; *People* v. *Superior Court* (*Kenner*) (1977) 73 Cal.App.3d 65 [139 Cal.Rptr. 343]; *In re Johnny V.* (1978) 85 Cal.App.3d 120, 132 [149 Cal.Rptr. 180], but see *People* v. *Evans* (1980) 108 Cal.App.3d 193, 196 [166 Cal.Rptr. 315]), the use of *a ruse* to persuade a potential arrestee *to leave* a house, thereby subjecting himself to arrest on the street where the concerns attendant to *Ramey* are not present is not necessarily precluded. (See *People* v. *Tillery* (1979) 99 Cal.App.3d 975, 979-980 [160 Cal. Rptr. 650].) We need not, and do not, base our holding on this distinction, however, for as indicated, there is nothing in the instant record to compel us to overrule the trier of fact's decision to credit the testimony of the prosecution's witnesses which established that (1) no ruse was involved and (2) it was not the officers' initial intent to arrest appellant.

For more than a quarter of a century in this state the holding of *People* v. *Michael* (1955) 45 Cal.2d 751 [290 P.2d 852] has stood unchallenged. Its observations, though directed to a far more compelling situation than confronts us here, are equally apposite in the present instance: "All that appears is that four officers went to defendant's home, identified themselves, and were admitted by defendant's mother. Within approximately a minute of their arrival they asked defendant if she had any narcotics, and all of the evidence was then voluntarily produced by the two women. Under these circumstances, to hold as a matter of law that the evidence was produced in response to an unlawful assertion of authority would seriously hamper officers in the reasonable performance of their duties. Thus, it is not unreasonable for officers to seek interviews with suspects or witnesses or to call upon them at their homes for such purposes. Such inquiries, although courteously made and not accompanied with any assertion of a right to enter or search or secure answers, would permit the criminal to defeat his prosecution by

voluntarily revealing all of the evidence against him and then contending that he acted only in response to an implied assertion of unlawful authority." (P. 754.) Of course, as stressed in *Michael*, an officer's request for permission to speak with the occupant of a residence must not be "accompanied with any assertion of a right to enter" since long before *Ramey*, it was recognized that even "[a] suspect has no duty to cooperate with officers in securing evidence against him, and in the absence of probable cause to make an arrest, he is entitled to have a magistrate determine whether there is justification for invading the privacy of his home. [Citations.]" (*People* v. *Shelton* (1964) 60 Cal.2d 740, 746 [36 Cal.Rptr. 433, 388 P.2d 665].) The court in *Ramey* did no more than require that, absent exigent circumstances, the intervention of a magistrate must be sought *even when probable cause to arrest does exist* prior to making a nonconsensual entry into a house to effect that arrest.

In sum, absent some exceptional emergency, an officer has no right to demand or force his way into a residence, *merely to investigate*, and we know of no rule extending to a magistrate the power to authorize the police to invade a residence merely "to detain" someone for investigative purposes in the absence of probable cause to arrest. While it is true that the implications of certain expressions used in *People* v. *Williams* (1979) 93 Cal.App.3d 40, 57 [155 Cal.Rptr. 414], such as "defendant's warrantless detention in his home" might suggest to the contrary, we do not believe the authors of *Williams* intended to "overrule" the repeated holdings of our highest court on this issue.

As noted in *James* v. *Superior Court* (1978) 87 Cal.App.3d 985, 994 [151 Cal.Rptr. 270], the rationale of *Ramey* does not apply "[w]here the officers do not clearly have probable cause to arrest and the officers approach the residence to further obtain such probable cause and such probable cause then arises after the suspect opens the door and refuses to come out," or, as in our case, after the party to be investigated has voluntarily left the premises.

Of course, if the probable cause to arrest arises *after* the officers have been voluntarily permitted to enter a residence in connection with their investigative work, an arrest may then be effected within the premises without the officers being required to beat a hasty retreat to obtain a warrant. As stressed in *People* v. *Ford* (1979) 97 Cal.App.3d 744, 747-748 [158 Cal.Rptr. 859], "the prohibition found in *Ramey* against warrantless arrests in the home is predicated upon the fact of an

unjustifiable *entry* into the home, which then provides the opportunity to arrest. Stated otherwise it is the unlawful *intrusion* into the dwelling which offends constitutional safeguards and which is therefore at the heart of the matter, rather than the arrest itself. Conversely, when no such illegal entry has occurred the fact an accused is arrested in his home is in itself of no greater significance than if he were arrested elsewhere." (Italics in original; fn. omitted.)

Any rule which, when implemented, would pragmatically preclude our peace officers from investigating known or reported criminal activity because they lack probable cause to obtain an arrest or search warrant, would serve no rational purpose. The guilty, of course, have exactly as great a right to privacy as the innocent, *but they have no greater.* (*People* v. *Lara* (1980) 108 Cal.App.3d 237, 241 [166 Cal.Rptr. 475]; *People* v. *Kaaienapua* (1977) 70 Cal.App.3d 283, 288 [138 Cal.Rptr. 651].)

The order of wardship is affirmed.

Lillie, J., and Hanson (Thaxton), J., concurred.