[Crim. No. 36279. Second Dist., Div. One. June 25, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
ERZEBET SZABO, Defendant and Appellant.

**COUNSEL**

Timothy S. Murakami, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Shunji Asari and Roy C. Preminger, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

RADIN, J.*—Erzebet Szabo, appellant, and two codefendants Joseph Csemer and Helen Csemer were charged with three counts of burglary (Pen. Code, § 459), three counts of grand theft (Pen. Code, § 487, subd. 1), three counts of receiving stolen property (Pen. Code, § 496), and one count of conspiracy to commit burglary and theft (Pen. Code, §§ 182, subd. 1, 459, 487, subd. 1).

Appellant's motion to suppress evidence under Penal Code section 1538.5 was denied, and appellant pleaded guilty to two counts of receiving stolen property. The People dismissed the remaining eight counts.

The appeal is from the judgment of conviction after denial of the section 1538.5 motion.

Proceedings were suspended; appellant was granted probation on condition that she spend the first year in county jail. She was given credit for 170 days of presentence custody. A stay of execution was granted to September 26, 1980.

STATEMENT OF FACTS

On April 11, 1979, at approximately 2:30 a.m. Sergeant Jack Douglas went to the Greenberg home to investigate a reported burglary/ robbery. The reporting party was the "live-in-maid," whom he discovered to be bound hand and foot when he arrived. She told him she was awakened about 2 a.m. at gunpoint by three dark-skinned males who wore masks and gloves, tied her up and ransacked the house. She described the missing items as stereo equipment, television sets, silverware, clothing, suitcases and linens.

Earlier that evening another police officer had observed an orange van with a single front license plate parked in front of the Greenberg home and had taken the license number. After the burglary/robbery, it was learned the suspicious van had been reported stolen at one time by a Joseph L. Csemer of 1550 Hobart in Los Angeles. Police officers went to that address and located the van in the subterranean garage. They observed through the front windshield a reel-to-reel tape recorder, a T.V. set and other items covered with sheets.

*Assigned by the Chairperson of the Judicial Council.

Sergeant Douglas arrived at the Hobart location between 4 and 4:30 a.m. From the street, he could see the garage and the rear portion of an orange van without rear license plates parked inside the garage. He drove into the garage, parked next to the van, and walked to the front of it which was parked head first against the wall. He found the front license plate to bear the same number as the one on the van parked in front of the burglarized home earlier. Using a flashlight, he illuminated the interior of the van and saw a reel-to-reel tape recorder, a large tape deck, a portion of a T.V. set and sheets, all items which matched the description of property taken from the Greenberg home. He also saw what appeared to be pillowcases full of property.

He drove out of the garage, parked his car and walked toward the apartment building to check the names on the mail boxes to determine if Joseph Csemer lived there. As he approached the building, he saw a male (Joseph Csemer) walk from the garage to the sidewalk in front of the building, look in both directions and stop when he saw Officer Douglas. The officer walked up to him, said "Good morning," and asked him if he lived in the building. He nodded.

The officer asked him if he was the manager; he said "No." He asked him if he lived there. Csemer gave a vague reply indicating he did.

The officer then asked him if he knew who owned the orange van. He indicated he did not.

The officer asked him his name two times, but each time the answer was incomprehensible except the first name started with the letter J. The officer asked him for identification; he said he had forgotten his wallet in his apartment.

The officer observed Mr. Csemer becoming agitated and nervous, and becoming concerned for his safety, he performed a pat-down search. Detecting a wallet and key-ring in Mr. Csemer's pockets, he asked for identification again. The individual then produced a selective service card with the name "Joseph Csemer."

Sergeant Douglas recognized the name as the one on the stolen report, and advised Joseph Csemer he was being detained on suspicion of burglary and robbery.

A short time later codefendant Helen Csemer exited the building and approached them. She identified herself as Joseph Csemer's wife. The officers asked her if anyone else was in the apartment. She replied no and would take Officer Douglas inside the apartment and show him.

The door to the apartment building was locked. Mrs. Csemer said she had forgotton her keys. The officer said he believed her husband had keys in his pocket and asked if she wanted him to get them. She responded, in effect, that will be fine. When Mr. Csemer's keys did not open the door, Officer Douglas entered the apartment house through the garage, opened the front door from inside for Mrs. Csemer and his partner.

As they approached the Csemer apartment, Douglas told his partner that he did not want to enter alone; Mrs. Csemer threw her hands in the air and said, "There's no men in there with guns; come on, I'll show you." Douglas told her it was not necessary, and she again responded impatiently, "Come on, I'll show you." She entered first, followed by the two officers.

Sergeant Douglas observed that the apartment was "crammed" with different items, including television sets, flatware, tea sets, expensive linens, suitcases and musical equipment. In a jewelry box that was propped open, he saw a Master Charge credit card in the name of Lillian Greenberg.

At this point, Mrs. Csemer was placed under arrest for receiving stolen property.

About 8 or 9 a.m., Detective Lemke arrived at the apartment. On a table he saw a photograph of appellant whom he recognized because he had interviewed her as the reporting party of a burglary at a residence belonging to a Mr. and Mrs. Alex Coleman about six months earlier. Mrs. Csemer identified the woman in the photograph as a friend, "We're from Hungary." His attention was called to a large manila envelope with the name Alex Coleman on it. While in the apartment, Detective Lemke observed two checks dated April 9 and April 11 made out to appellant, one written by Mrs. Greenberg. When asked when she saw the appellant last, Mrs. Csemer said two or three weeks before. (This was April 11.)

After returning to police headquarters and obtaining a copy of the Greenberg burglary/robbery report, Detective Lemke noted that appellant was the reporting party. He and two other officers then went to the Greenberg home, arrested appellant, took her to the Beverly Hills jail, and booked her. Among her property was a business card for a storage company with a locker number and a telephone number.

Advised of her constitutional rights, appellant responded that she did not understand. The officer then asked her if she had rented a storage locker in the Silverlake area. She replied she had. He asked her if he could look inside the locker. She replied he could. He asked her where the key was; she said in her property that had been booked. He found it, showed it to her, and asked if it was the key to the storage locker. She replied it was. When he asked her if she would consent to a search of the locker, appellant consented.

In the locker Officer Lee found various items of property, including items which had been stolen from the Coleman house when appellant worked for the Colemans.

### CONTENTIONS

Appellant contends that all evidence obtained as a result of each of the following errors should be suppressed:

1.   The officers' observations of the contents of the van constituted an unreasonable search.

2.   The detention of Mr. Csemer was unlawful.

3.   The pat-down search of Mr. Csemer was unlawful.

4.   Codefendant Helen Csemer did not voluntarily consent to the entry of her apartment.

5.   Even if the entry was lawful, the search exceeded the scope of the consent.

6.   The arrest of appellant was unlawful.

7.   Appellant's consent to search the storage locker was the product of an illegal interrogation.

## DISCUSSION

■ A proceeding under Penal Code section 1538.5 to suppress evidence is a full hearing on the issues before the superior court sitting as finder of fact. (*People v. Superior Court (Peck)* (1974), 10 Cal.3d 645, 649 [111 Cal.Rptr. 565, 517 P.2d 829].)

The power to judge credibility of witnesses, resolve conflicts in testimony, weigh evidence and draw factual inferences, is vested in the trial court. On appeal all presumptions favor proper exercise of that power, and the trial court's findings—whether express or implied—must be upheld if supported by substantial evidence. (*People v. Gale* (1973) 9 Cal.3d 788, 792 [108 Cal.Rptr. 852, 511 P.2d 1204]; *People v. Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621].)

■ The first issue in the chain of events leading to the appellant's arrest involved the police officer's entry into the garage of the building where codefendants Joseph and Helen Csemer lived and their observations of the van's interior with a flashlight.

It is incontrovertible that the touchstone of the Fourth Amendment is reasonable expectation of privacy (*Katz v. United States* (1967) 389 U.S. 347 [19 L.Ed.2d 576, 88 S.Ct. 507].) The appellant argues that the owner of the orange van had a reasonable expectation of privacy as to the property contained in the load portion of the van. It was parked in a private garage head first against a wall. Further, most of the property in the van was covered with sheets or pillowcases. ■ However, police officers in the performance of their duties may, without violating the Constitution, peaceably enter upon the common hallway of an apartment building without a warrant or express permission to do so and such an entry does not invalidate a subsequent search and seizure. (*People v. Terry* (1969) 70 Cal.2d 410, 437 [77 Cal.Rptr. 460, 454 P.2d 36].)

In *People v. Bradley* (1969) 1 Cal.3d 80, 85 [81 Cal.Rptr. 457, 460 P.2d 129], marijuana plants were discovered and seized in a rear yard that was fenced and located 20 feet from defendant's door "to which presumably delivery men and others came, and the front house, as well as defendant's house, apparently had access to the yard." The court held there was no reasonable expectation of privacy under the circumstances and no violation of the constitutional prohibition against unreasonable search and seizure.

■ In the instant case, the garage in which the orange van was parked was for a 30-unit apartment house. There was no gate or sign denying access to the garage to anyone who might enter it, whether tenant, visitor or delivery man, or anyone who might mistakenly walk or drive into it. As in the *Bradley* case, the appellant could not have reasonably expected privacy in such a garage.

The orange van was visible from the street, was without a rear license, and was located at the address of the person who had at one time reported it stolen. It matched in all respects the suspicious van that had been parked in front of the Greenberg home before the burglary/robbery was reported.

We find the police lawfully entered the garage to investigate the van.

The appellant next argues that when the police used a flashlight to view the interior of the van they were "optically aided," resulting in a warrantless invasion of privacy right.

The cases appellant cites for "optical aids" include binoculars, telescopes, and the like. (*People* v. *Arno* (1979) 90 Cal.App.3d 505 [153 Cal.Rptr. 624]; *Burkholder* v. *Superior Court* (1979) 96 Cal.App.3d 421 [158 Cal.Rptr. 86].)

The test is whether the view is observable to anyone not using an optical aid, and the cases are clear that a flashlight used by a police officer is similar to illumination by daylight, moonlight, lights within the vehicle, street lights, neon signs or light from adjacent vehicles. (*People* v. *Superior Court* (*Mata*) (1970) 3 Cal.App.3d 636, 639 [84 Cal.Rptr. 81].) We agree with *People* v. *Rios* (1975) 51 Cal.App.3d 1008, 1012 [124 Cal.Rptr. 737], which holds that illumination by flashlight is of no significance, and we conclude in no way is an optical aid.

■ Next, appellant contends that the detention and pat-down of Mr. Csemer were unlawful and the evidence obtained as a result should have been suppressed.

■ Investigative detention is unlawful if based on mere curiosity, rumor or hunch even if the officer acts on good faith. (*In re Tony C.* (1978) 21 Cal.3d 888 [148 Cal.Rptr. 366, 582 P.2d 957]; *Terry* v. *Ohio* (1968) 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868].)

A police officer may not detain and question a person when there are no circumstances which would indicate to a reasonable person in a similar position that such a course is necessary to the proper discharge of the officer's duties. (*People v. One 1960 Cadillac Coupe* (1964) 62 Cal.2d 92, 95-96 [41 Cal.Rptr. 290, 396 P.2d 706].)

In the instant case, the officer was at a location where he viewed stolen property from the Greenberg house in the orange van that had been parked in front of that home a short time before the burglary/robbery was reported. He was at the apartment house address of the probable owner of the van; it was about 4:30 a.m., approximately two hours after the crimes were committed. Hoping to get information about the owner of the van, he started a conversation with a man coming out of the garage toward the apartment building. When Mr. Csemer appeared progressively more agitated and nervous, the officer asked his name. The only part the officer could understand was the first name started with the letter J. Otherwise, it seemed to the officer Mr. Csemer was making an obvious attempt to be incomprehensible as he mumbled it. Then the officer asked for his identification, which he said he did not have. Because he was investigating an armed robbery with three suspects who were possibly in the immediate area, the officer fearing for his safety proceeded to pat-down Mr. Csemer which resulted in his learning of Mr. Csemer's identity.

The detention and pat-down were not based on rumor, curiosity or hunch, but under circumstances that made the officer's course of action necessary to the proper discharge of his duties. As a reasonably prudent man, he was warranted in the belief that his safety was in danger. (*Terry v. Ohio* (1968) 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868].)

The next issue raised by appellant is that codefendant Helen Csemer did not voluntarily consent to the entry of her apartment, but rather submitted to an implied assertion of authority. Consequently all evidence obtained as a result of the police officer's entry should be suppressed. We find no merit in her contention.

In the case of *People v. James* (1977) 19 Cal.3d 99 [137 Cal.Rptr. 447, 561 P.2d 1135], the defendant said that when he gave his consent to search, he was standing alone with three armed officers around him. He contended these facts showed that his consent was a mere submission to authority because he was "under the total domination and control of the police." The court held that California cases that have in-

validated findings on this ground have involved far more coercive circumstances or additional facts such as an illegal arrest or false claim of authority to search.

In the instant case the police did not request the search; Mrs. Csemer actually invited the police to investigate the apartment for possible armed individuals—not once, but twice—first when they were outside the building and again when outside the apartment.

Appellant also raises the issue that Mrs. Csemer was never warned of her right to refuse permission to search.

It is well settled in a long line of decisions that advising a person of their constitutional rights to refuse a consent to a search is not a prerequisite to a voluntary consent to search. (*People* v. *James, supra,* 19 Cal.3d 99.)

We find the search of the apartment was with Mrs. Csemer's voluntary consent.

The next issue raised by appellant is that the search of the apartment by the police exceeded the scope of the consent.

It is true that the reason for the entry into the apartment was to determine if there were any other suspects in it, and "the authority to search pursuant to a consent must be limited to the scope of the consent." (*People* v. *Superior Court* (*Arketa*) (1974) 10 Cal.App.3d 122, 127 [111 Cal.Rptr. 565, 517 P.2d 829].)

The People's position is that the items seen and identified as stolen property including the Master Charge credit card with Mrs. Greenberg's name on it, were in plain view. And furthermore, they contend that some of the items observed in plain view were similar in description to items taken from the Greenberg house.

Police officers do not have to blind themselves as to what is in plain sight simply because it is disconnected with the purpose for which they entered the premises. (*People* v. *Superior Court* (*Meyers*) (1979) 25 Cal.3d 67 [157 Cal.Rptr. 716, 598 P.2d 877].) Objects falling in plain view of a law enforcement officer who has a lawful right to be in a position to have that view are subject to seizure and may be intro-

duced into evidence. (*North* v. *Superior Court* (1972) 8 Cal.3d 301, 306 [104 Cal.Rptr. 833, 502 P.2d 1305, 57 A.L.R.3d 155].)

■ Adding all of the items together which the police had observed based on the information they had: the Master Charge credit card in Mrs. Greenberg's name, the checks made payable to appellant by Mrs. Greenberg, the photograph of appellant in the apartment, the van with items in it from the Greenberg home—all in plain view—gave the police legal and proper reason to seize these items (*People* v. *Jackson* (1970) 14 Cal.App.3d 57, 66-67 [92 Cal.Rptr. 91]).

■ Now we come to appellant's arrest within the Greenberg residence where she lived and worked. She contends that absent a warrant it was unlawful and all fruit from it should be suppressed. She argues there was no reason to believe she would flee, and even if there was, due to the possibility of her being telephoned and warned by the Csemers, the police should have "staked out" the residence while they served a warrant. Then, if she took flight, they could have arrested without a warrant.

Appellant cites *People* v. *Ramey* (1976) 16 Cal.3d 263, 275-276 [127 Cal.Rptr. 629, 545 P.2d 1333], in support of her position which states that "Warrantless arrests within the home are per se unreasonable in the absence of exigent circumstances."

In the *Ramey* case the defendant was arrested in his own home, and it was shown that he was not likely to flee the jurisdiction. Also, there was a three-hour delay between the time the information was given to police and the defendant's arrest in his home, a period in which no effort was made to obtain a warrant. The court in the *Ramey* case held no exigent circumstances existed justifying defendant's arrest without a warrant. There had been no showing of a likelihood of defendant's flight or his destruction of the evidence. "'[E]xigent circumstances' means an emergency situation requiring swift action . . . to forestall the imminent escape of a suspect or destruction of evidence." In each case the claim of an extraordinary situation must be measured by the facts known to the officers. (*People* v. *Ramey, supra.*)

In the case at bench the police had probable cause to arrest. The fact that appellant was the reporting party in the Greenberg burglary/robbery, and that stolen items from the Greenberg home taken during the burglary were in the apartment of appellant's friends, the Csemers,

were sufficient to warrant a prudent person in believing the appellant had participated in that crime. (*Beck* v. *Ohio* (1964) 379 U.S. 89, 91 [13 L.Ed.2d 142, 145, 85 S.Ct. 223].)

A telephone call from Mr. or Mrs. Csemer after they were booked in jail warning appellant of her vulnerability was not unlikely. The only address the appellant had was the Greenberg house. She had no ties to it, however, having worked there as a maid a short time. In her flight she could have taken additional valuables while the warrant was being obtained.

We conclude exigent circumstances existed for the warrantless arrest of appellant.

The last issue raised by appellant is that her consent for search of the storage locker was the product of an illegal interrogation.

Appellant said she did not understand the officer when he attempted to advise her of her *Miranda* rights. However, she then proceeded to answer his questions: (1) Did she have a storage locker. (2) Could he look inside it. (3) Where was the key to the locker after he found the key and showed it to her. (4) Was that the right key. and (5) Would she consent to a search of the locker.

She answered all the above questions in the affirmative.

It is not necessary to advise a person of her right to refuse to consent before asking her consent to search. (*People* v. *James* (1977) 19 Cal.3d 99 [137 Cal.Rptr. 447, 561 P.2d 1135].)

The fact that a defendant is in custody at the time of giving consent is significant, but not conclusive of it being a voluntary consent, and is to be weighed with all other circumstances bearing on the issue.

It is but one of the factors, but not the only one, to be considered by the trial judge who sees and hears the witnesses and is best able to pass upon the matter. (*People* v. *James, supra*, at pp. 109-110; *People* v. *Smith* (1966) 63 Cal.2d 779, 798 [48 Cal.Rptr. 382, 409 P.2d 222]; *People* v. *Valdez* (1961) 188 Cal.App.2d 750, 756 [10 Cal.Rptr. 664].)

We are not convinced that appellant did not understand the officer's questions. If this were a fact, she would have told him she did not un-

derstand instead of giving her acquiescence to each of five questions, some spaced apart. We do not find that appellant's consent was the product of an illegal interrogation.

The judgment is affirmed.

Jefferson (Bernard), P. J., and Lillie, J., concurred.