[Crim. No. 42497. Second Dist., Div. Seven. Jan. 18, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
STANLEY MICHAEL SAWKOW et al., Defendants and Appellants.

## COUNSEL

Charles Earl Lloyd and Susan Alane Aaronson for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Howard J. Schwab and William R. Pounders, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SCHAUER, P. J.**—Appellants appeal from judgments of conviction entered on their pleas of nolo contendere following denial of their motions to suppress evidence pursuant to Penal Code section 1538.5. The two principal issues before the court are: First, whether the state met its burden to justify a police detention under the Fourth Amendment to the United States Constitution and article I, section 13 of the California Constitution. Secondly, whether a search warrant should have been quashed due to an inaccurate affidavit containing deliberate falsehoods, or material or intentionally misleading omissions.

I. *Statement of facts*

The evidence, viewed in a light most favorable to the People, showed that on April 1, 1980, one Peter Walters commenced work as controller and bookkeeper for Hygin Sanitary Supply Company, Inc. (Hygin), with authority to prepare checks for accounts payable, and to make payment after the checks were signed by Harold Howard, president of Hygin. On September 25, 1980, two Hygin employees informed Howard that Walters was engaging in unusual and perhaps suspicious behavior: He was never without his briefcase; he regularly parked his car several blocks away from Hygin; he received a daily call at the time of the mail delivery from an "uncle or cousin," apparently from a public telephone, after which Walters would himself make a call, also from a public phone, and would thereafter walk to the Bank of America (bank) next door. Hygin employee Norma Nicholas had also twice seen Walters at the bank meeting a tall, heavy-set, round-faced man with a light complexion and freckles, who stood by while Walters

transacted his business, after which both men would proceed to the other man's car.

His suspicions aroused, Howard and his accountant looked inside Walters' desk and found irregularities in Walters' records of two company bank accounts, including signed company checks which should have been mailed out long before, missing cancelled checks and corresponding pages from bank statements, and a document with dates, figures, and numbers which were determined by the accountant to reflect unauthorized deposits by Walters from accounts receivable into a petty cash account under Walters' control. Upon review, it was determined that Hygin had sustained a loss of approximately $395,000. On September 27 and 29, 1983 Howard, suspecting embezzlement, reported the matter to police authorities, who advised him to return to Hygin and pretend nothing had happened. On Monday, September 29 Walters was seen arriving at his office, taking a brief look around, and leaving abruptly. He was not seen again. A check of the license number of Walters' vehicle revealed it was registered to a Craig Peter Desrosiers, who was later identified as Walters by Hygin employees from a photo lineup including Desrosiers' driver's license photograph. Desrosiers was charged with grand theft and remains a fugitive.

On Tuesday morning, September 30, a call for Walters was received at Hygin from someone identifying himself as Walters' uncle. On advice of police officer Thomas King, the caller was told that Walters would meet him at the bank between 11 and 11:30 a.m. Later that morning, King and Officer Manuel Sierra parked their unmarked police car in the bank parking lot, accompanied by Nicholas in the event she could identify Walters' "uncle," and waited. Shortly thereafter a silver-grey Lincoln drove into the parking lot and parked approximately 120 feet from the police vehicle. Several minutes later two men emerged from the front seat of the Lincoln, walked slowly past the bank entrance, looked in the direction of Hygin, and proceeded to a nearby hamburger stand, where they stood near a public telephone. One of the men, later identified as appellant Sawkow, wore a large amount of gold jewelry and resembled the description given by Nicholas of Walters' "uncle." Sierra exited the police vehicle and followed the two individuals on foot, observing some of their movements. Some 15 or 20 minutes later the 2 remaining occupants emerged from the Lincoln and walked to the area of the telephone and hamburger stand, where they loitered with the others near the telephone. Several minutes later Officer Sierra returned to the police car, and shortly thereafter one of the occupants of the Lincoln (later identified as appellant Honore) returned to the parking lot, looked at the occupants of the police car, drove the Lincoln to the hamburger stand, and briefly met his companions inside, after which all four got into the Lincoln and drove off. Nicholas, having told King that one

of the occupants of the Lincoln had the "coloration and somewhat of the build" of Walters' "uncle," but unable to make a positive identification, returned to Hygin. The officers, on the basis of one person's resemblance to Walters' "uncle" and the gold jewelry he wore,[1] as well as the suspicious conduct theretofore displayed by the occupants of the Lincoln,[2] decided to follow in the police vehicle. After making numerous turns and changes of direction on surface streets, the Lincoln proceeded north on the Harbor Freeway, exceeding the speed limit and making several lane changes. At this point King believed the occupants of the Lincoln may have been involved in the Hygin embezzlement and were attempting to avoid his surveillance, and hence he decided to stop the Lincoln. He followed the Lincoln north on the Pasadena Freeway, recorded its license plate number, and summoned additional assistance by radio. The Lincoln left the freeway in Highland Park and stopped in a driveway on Roselawn Place. As the occupants emerged from the vehicle, they were detained by uniformed patrolmen (the September 30 detention). King approached Sawkow and noticed that he had marks on his arms indicating fresh puncture wounds, his nose was running, his eyes were watery, his movements were slow and lethargic, his eyes were "pinpointed," and his speech was slurred. King arrested Sawkow for being under the influence of an opiate,[3] searched Sawkow's wallet during an administrative search prior to booking, and found the business card of a police investigator. King thereafter spoke with that investigator and learned that Sawkow was charged in a robbery case scheduled in Van Nuys on October 27. He also later learned that Sawkow was on federal parole.

Los Angeles Police Sergeant Dominick Domino, a detective with the bunco-forgery division specializing in fraud and embezzlement cases, was called in on the matter during the first or second week in October. Shortly thereafter, following discussions with King, Domino obtained a booking photograph of Sawkow from a police officer assigned to the Van Nuys rob-

---

[1]King testified during appellants' preliminary hearing that he knew on September 30 that Hygin "money had been used to purchase large amounts of gold," and that fact has been assumed to be true by the parties hereto. However, we have found nothing in the record to confirm that such information was available on that date.

[2]The following behavior of the Lincoln's occupants aroused the officers' suspicions: they parked in the bank lot and not in the hamburger stand lot 300 feet away; the person resembling Walters' "uncle" loitered near the public phone which the officers believed had been used in connection with the Hygin embezzlement; each time a person emerged from the Lincoln, he looked in the direction of Hygin; the suspects' behavior was consistent with casing the area for a bank robbery; 2 persons remained in the Lincoln for up to 20 minutes, on a very warm day.

[3]The misdemeanor charge was later dismissed at the request of the district attorney's office, to avoid double jeopardy problems in view of the later finding for embezzlement. The charge was dismissed for "insufficient evidence" on January 8, 1981.

bery trial. Domino prepared a photo lineup including Sawkow's photo and five others and showed it to Nicholas, who did not identify Sawkow.

On October 27 Domino attended the Van Nuys robbery hearing and observed Sawkow, accompanied by another man later identified as Honore.

After determining from bank microfilm records (supplied to him by Hygin) that Hygin checks reported missing by Howard had been used to make purchases at several coin shops, Domino visited Doyle's Plaza Coin and verified through sales receipts naming Hygin as purchaser that such purchases had indeed been made. In late October or early November, Domino showed the photo lineup previously shown to Nicholas to Randy Conway, a Doyle's Plaza Coin employee. Conway identified Sawkow as the purchaser of gold coins, and Domino became convinced that Sawkow was involved in the Hygin embezzlement. He returned to Doyle's Plaza Coin on December 4, at which time the shop's owner also identified Sawkow in the photo lineup as having purchased gold coins with Hygin checks.

Domino also visited the Coin Palace, where employees confirmed that gold and silver coins had twice been purchased with Hygin checks by a man whose description resembled the man observed by Domino with Sawkow at the October 27 robbery hearing in Van Nuys (Honore).

On December 8 Domino executed an affidavit (Affidavit) for the issuance of a warrant (Warrant) for the arrest of Sawkow and Honore, and for the search of their residence and vehicle (the Lincoln). The Warrant was issued, and on the following day the defendants were arrested and the residence was searched, resulting in the seizure of evidence linking the defendants to the crimes with which they were later charged.[4]

Defendants' motions to dismiss pursuant to Penal Code section 995, and to suppress and traverse the warrant and for return of property pursuant to Penal Code sections 1538.5-1540, were denied on April 23, 1981. The motions were based on the grounds that the affidavit for the warrant was based on false information and on illegally seized evidence.[5]

---

[4]The items seized included a resume for a Peter Walters, photographs (including one depicting Sawkow, Honore, and Desrosiers), vehicle registration stubs, business cards, telephone records indicating a large number of calls to Hygin during the time of Walters' employment by the company, and a receipt and keys for a safe deposit box at Coast Savings and Loan in Diamond Bar. A search warrant for the safe deposit box was later obtained and executed, yielding several gold coins. A search warrant was also later issued authorizing the search of telephone records.

[5]Appellants contend that the September 30 detention was unlawful, and hence all evidence adduced therefrom should have been suppressed, including derivative "fruits" of the alleged illegality. (*Wong Sun* v. *United States* (1963) 371 U.S. 471 [9 L.Ed.2d 441, 83 S.Ct. 407].)

On April 15, 1982, defendants entered pleas of nolo contendere to a number of charges. This appeal is from the denial of defendants' motions to suppress evidence and to traverse the warrant. We will affirm.

II. *The September 30 detention was lawful.*

Appellants contend that the September 30 detention was unlawful, and hence all evidence as a result thereof should have been suppressed. We disagree, as under the controlling rules the circumstances known to the police officers justified the detention.

It is well established that circumstances short of probable cause to make an arrest may still justify police officers in briefly stopping or detaining a person for questioning or other limited investigation upon a reasonable suspicion that the person is involved in criminal activity. (*People* v. *Bower* (1979) 24 Cal.3d 638, 644 [156 Cal.Rptr. 856, 597 P.2d 115]; *In re Tony C.* (1978) 21 Cal.3d 888, 892-894 [148 Cal.Rptr. 366]; *People* v. *Michelson* (1963) 59 Cal.2d 448, 450 [30 Cal.Rptr. 18, 380 P.2d 658]; *Terry* v. *Ohio* (1968) 392 U.S. 1, 22 [20 L.Ed.2d 889, 906, 88 S.Ct. 1868].) In order to justify an investigative stop or detention, the prosecution must establish that the circumstances known or apparent to the officer include specific and articulable facts which reasonably caused him to suspect that "(1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person he intends to stop or detain is involved in that activity." (*In re Tony C., supra,* 21 Cal.3d at p. 893; see also *People* v. *Loewen* (1983) 35 Cal.3d 117, 123 [196 Cal.Rptr. 846, 672 P.2d 436]; *Wilson* v. *Superior Court* (1983) 34 Cal.3d 777 [195 Cal.Rptr. 671, 670 P.2d 325]; *Florida* v. *Royer* (1983) 460 U.S. 491, 498-499 [75 L.Ed.2d 229, 237, 103 S.Ct. 1319].) A detention based on mere curiosity, rumor, or hunch, however, is unlawful regardless of the good faith of the officer. (*In re Tony C., supra,* 21 Cal.3d at p. 893.)

Applying the foregoing rules to the case at bench, we conclude that the facts known to King at the time of the December 30 detention of appellants, viewed collectively, justified his conclusion that appellants were engaging in activity out of the ordinary and related to the Hygin embezzlement. Before proceeding to enumerate those circumstances, we note at the outset that appellants' detention was not a response to unexpected events encountered by police officers while in the performance of their duties, but rather the culmination of concerted action directed toward the identification and apprehension of the perpetrators of a specific crime, namely, the Hygin embezzlement. To this end, King arranged for a rendezvous and conducted a stakeout of the bank parking lot, expecting a suspect's arrival and armed with a general description of that suspect. They were not disappointed. The

arrival of the Lincoln at or near the time of the appointment was the first of a number of circumstances known to the officers which, when viewed collectively, reasonably justified the detention of its occupants. Those circumstances include: (1) the resemblance of one person (Sawkow), in coloration and build, to Walters' "uncle" as previously described by Nicholas, together with Nicholas' impression during the stakeout that such person's physiognomy matched that of the "uncle"; (2) the large amount of gold jewelry worn by that person, in view of Officer King's awareness that embezzled Hygin funds had been used to purchase gold; (3) the suspects' presence near the public telephone reportedly used by suspects in the embezzlement; (4) the suspects' indecisive and vacillating behavior, consistent with anticipation of someone's arrival; (5) the suspects' glances toward Hygin; and (6) the erratic driving pattern displayed by the Lincoln while being followed by the officers.

█ In determining the reasonableness of a detention, "the totality of the circumstances—the whole picture—must be taken into account. . . . [A]n assessment of the whole picture must yield a particularized suspicion . . . that the particular individual being stopped is engaged in wrongdoing." (*United States* v. *Cortez* (1981) 449 U.S. 411, 417-418 [66 L.Ed.2d 621, 628-629 101 S.Ct. 690].) █ While each of the circumstances we have enumerated is consistent with innocent activity, and hence none of them standing alone would justify a detention, we conclude that together they "constitute[d] minimum but adequate recognizable and articulable factors" (*In re Eduardo G.* (1980) 108 Cal.App.3d 745, 754-755 [166 Cal.Rptr. 873]) to support the officers' reasonable suspicion that the Lincoln's occupants were involved in criminal activity, and hence the September 30 detention was lawful. (*In re Tony C., supra,* 21 Cal.3d 888; *People* v. *Szabo* (1980) 107 Cal.App.3d 419 [165 Cal.Rptr. 719].)[6]

█ We further hold that there is substantial evidence in the record to support the finding that Sawkow's consequent arrest for being under the influence of an opiate was lawful. Officer King was a veteran of approximately 200 narcotics arrests, and his observations of Sawkow's demeanor and behavior provided probable cause to make the arrest. Accordingly, the evidence adduced from appellants' detention and Sawkow's arrest was admissible, and appellants' motion to suppress such evidence was properly denied.

---

[6]Unlike *People* v. *Loewen, supra,* 35 Cal.3d 117, the police here had knowledge of a specific crime already committed, a felony (embezzlement) rather than a traffic violation, and they perceived appellants in spatial and temporal proximity to the known offense. Although each of the circumstances here is less than 100 percent compelling, each is entitled to some allowance more than zero and, viewed together, provide a reasonable suspicion that appellants were involved in criminal activity. (Compare *People* v. *Loewen, supra,* 35 Cal.3d at pp. 129-130.)

III. *The Affidavit was not fatally defective.*

Appellants contend that the trial court erred in denying their motions to quash the Warrant and to traverse the Affidavit in support thereof because the Affidavit contained deliberate falsehoods and reckless misstatements, as well as material or intentionally misleading omissions of facts bearing adversely on the issue of probable cause. We will discuss appellants' contentions in succession.

A. Appellants did not prove that the affidavit contained knowingly false statements of fact.

In *Theodor* v. *Superior Court* (1972) 8 Cal.3d 77 [104 Cal.Rptr. 226, 501 P.2d 234] our Supreme Court held that our constitutional guarantees against unreasonable searches and seizures,[7] and statutes regarding suppression of illegally obtained evidence, give a defendant the right to attack a facially valid search warrant affidavit on grounds that it contains negligent or deliberate misstatements of fact. The court held that if the affiant was *negligently* mistaken in certain of his allegations, they must be excised and the remaining allegations retested for probable cause (*id.,* at pp. 100-101; see also *People* v. *Kurland* (1980) 28 Cal.3d 376, 386 [168 Cal.Rptr. 667, 618 P.2d 213]), but left open the issue of the appropriate response to the presence of *intentional* misstatements in an affidavit. That issue was decided in *People* v. *Cook* (1978) 22 Cal.3d 67 [148 Cal.Rptr. 605, 583 P.2d 130]: "[O]nce the defendant has shown the affiant knowingly lied under oath in any respect" (*id.,* at p. 91), the integrity of the entire affidavit is cast into doubt, and the warrant must be quashed. (*Id.,* at pp. 74-75.)[8]

The burden of proof on the issue of the affiant's knowledge of falsity rests on the defendant, who must prove such knowledge by a preponderance of the evidence. Proof may be by admission of the affiant, by

---

[7]See footnote *8, infra.*

[8]The decision in *Theodor* was based on both the Fourth Amendment to the United States Constitution and the provision of article I, section 13 of the California Constitution. In *Franks* v. *Delaware* (1978) 438 U.S. 154, 155-156 [57 L.Ed.2d 667, 671-672, 98 S.Ct. 2674], the United States Supreme Court concluded that the federal clause imposes no sanctions for negligent misstatements and compels mere excision of intentional or reckless misstatements. Accordingly, the decision in *Cook* relied solely on California law (". . . *Franks* is not to be followed in California and . . . all challenges to the veracity of a search warrant affidavit are to be governed by . . . article I, section 13, of the California Constitution . . . .") (*People* v. *Cook, supra,* 22 Cal.3d 67, 88), as we do here. We further note that the "truth-in-evidence" provision of Proposition 8 (Cal. Const., art. I, § 28, subd. (d)) is inapplicable to the case at bench, as our Supreme Court has construed Proposition 8 to apply "only to criminal proceedings arising out of offenses committed on or after [June 9, 1982]." (*People* v. *Smith* (1983) 34 Cal.3d 251, 262 [193 Cal.Rptr. 692, 667 P.2d 149].)

circumstantial evidence, or, as attempted in the case at bench, by direct evidence in the form of testimony of percipient witnesses contrary to that of the affiant, in which case the conflict is resolved by the trier of fact. (*Id.*, at pp. 80, 89.)

In *Cook* the court further held that if an affiant makes a misstatement with conscious indifference to whether it is true or false—in other words, if he must have realized he did not in fact know an allegation was correct—the misstatement is deemed the equivalent of an allegation actually known to be untrue. (*Id.*, at p. 90.) Hence proof that a sworn allegation in an affidavit was both false and made with reckless disregard for the truth is sufficient to render the entire affidavit as untrustworthy as if the affiant had knowingly lied. (*Id.*, at p. 91; accord, *Franks* v. *Delaware, supra,* 438 U.S. 154.) And finally, it is not necessary to prove that the false allegations were made with the specific intent to deceive the magistrate. Proof that the affiant knowingly lied in any respect renders the remainder of his allegations suspect regardless of what his ulterior motives may have been. (*People* v. *Cook, supra,* 22 Cal.3d at p. 91; accord, *United States* v. *Belculfine* (1st Cir. 1974) 508 F.2d 58, 63.)

We must therefore determine whether the Affidavit at bench contains reckless or deliberate inaccuracy and therefore the Warrant should have been quashed, or whether it reflects a reasonable attempt at truth, in which event the magistrate's belief in Domino's credibility was not undermined, and hence no deterrent purpose would be served by vitiating the Warrant. (*People* v. *Cook, supra,* 22 Cal.3d at pp. 82-88; *People* v. *Kurland, supra,* 28 Cal.3d at p. 386; see also *People* v. *Anderson* (1983) 149 Cal.App.3d 1161 [197 Cal.Rptr. 413].)

Domino's affidavit contains the following statements: "Detective King advised me that he and Detective Sierra took [Nicholas], who had previously seen Desrosiers and the other man at the bank, to the bank location. Subsequently, a gray colored Lincoln automobile license 381 TRD drove into the bank parking lot.

"A man exited the vehicle and went to a pay phone. Detective King advised me [Nicholas] told them this person resembled the man she had previously seen at the bank with Desrosiers." Appellants contend that the last quoted sentence was intentionally or recklessly inaccurate since, when he applied for the Warrant, Domino "possessed knowledge expressly controverting the impression conveyed by that allegation." What appellants seem to be arguing is that Domino failed to disclose the facts underlying his "knowledge expressly controverting" the challenged statement. But this alleged failure to disclose would constitute an omission and not a misstate-

ment.[9] And, as will appear, for cogent reasons the procedures and remedies for omissions differ from those for misstatements. We must therefore examine Domino's Affidavit in view of the procedures and remedies applicable to an incomplete affidavit.

B. Appellants did not prove that the affidavit contained fatal omissions.

Appellants next assert that the Affidavit "intentionally omitted material information for the purpose of deceiving the magistrate," and therefore the Warrant should have been quashed.

In *People* v. *Kurland* (1980) 28 Cal.3d 376 [168 Cal.Rptr. 667, 618 P.2d 213], the court announced that a warrant affidavit may be as inaccurate when it omits facts as when it misstates them, and held that a defendant may attack a facially sufficient affidavit on grounds that it is incomplete. (*Id.*, at p. 384.) When the affiant intentionally omits any fact for the purpose of deceiving the magistrate or recklessly disregards the accuracy and completeness of the affidavit, the *Cook* analysis fully applies: The entire affidavit is rendered suspect, the judicial process is undermined, and hence the warrant must be quashed. (*Id.*, at p. 390.) The *Kurland* court noted, however, that absent an intent to mislead, the difference between misstatements and omissions calls for the application of different systems of procedures and remedies. While every falsehood makes an affidavit inaccurate, not all omissions do so. ■ An affidavit need only disclose

---

[9]The statement under challenge could be characterized as a misstatement only if (1) King did *not* advise Domino that Nicholas had noticed a resemblance between the stakeout suspect and the man she had previously seen with Desrosiers, or (2) Domino knew or should have known that King's statement to Domino to that effect was false. The evidence in the record does not support either of the foregoing suppositions. King's testimony at appellants' preliminary hearing, for example, includes the following statements:

"Q. Did you tell [Domino] that [Nicholas] pointed out Mr. Sawkow or a person who resembled a person she had seen in the bank?

"A. I told him she had stated that he resembled him, but she wasn't sure.

"Q. Now, when the individuals were getting out of that car, what did she say or what did you ask her?

"A. I asked her if anyone in that car looked like the person and I brought her attention to Mr. Sawkow and she said, 'I don't know, he has the coloration and the build,' but she did not go into it.

"Q. Would it be a fair statement that you told Sergeant Domino that [Nicholas] had told you that Mr. Sawkow resembled the man?

"A. Yes.

"Q. At the time you told that to Sergeant Domino, is that what you believed [Nicholas] had intended to say to you?

"A. That is correct.

"Q. What caused you to believe that?

"A. By her statements."

Although Nicholas' testimony is inconsistent with King's statements, the evidence in the record supports a finding by the trier of fact that King's testimony was veracious, and that Domino reasonably believed the information provided by King.

information, favorable and adverse, to enable the magistrate to make a reasonable, common sense probable cause determination. Accordingly, an affiant's duty of disclosure extends only to "material" adverse facts—those which, if omitted, would distort the probable cause analysis. (*Id.,* at pp. 384-385.) "A fact is material if its 'omission would make the affidavit *substantially misleading.*' [Citation.] That is, the omission is material if 'there is a substantial possibility (that its inclusion) would have altered a reasonable magistrate's probable cause determination.' [Citation.]" (*People* v. *Easley* (1983) 34 Cal.3d 858, 871 [196 Cal.Rptr. 309, 671 P.2d 813], italics in original; *People* v. *Kurland, supra,* 28 Cal.3d at p. 385.) And, in challenging a search warrant based on an affidavit containing omissions, the defendant bears the burden of showing that the omissions were material. (*People* v. *Easley, supra,* 34 Cal.3d at p. 871; *People* v. *Kurland, supra,* 28 Cal.3d at p. 390.) As will appear, we conclude that appellants have failed to meet that burden.

Appellants claim that two pieces of material information were omitted. First, the Affidavit failed to mention the "unlawful" September 30 detention and Sawkow's ensuing arrest, which appellants contend prevented the magistrate from determining whether the Affidavit was based on "impermissible fruits of unlawful police activity." Since, as we have explained, the September 30 detention was lawful, its mention in the Affidavit would have had the tendency to support rather than defeat a finding of probable cause. Hence there is no "substantial possibility" that inclusion of the omitted information could have had an adverse effect on the probable cause determination.

The second piece of omitted information was the failure to mention in the Affidavit that Nicholas was unable to identify Sawkow during the bank stakeout on September 30, and that Domino later showed Nicholas a photo lineup including Sawkow's picture and she was again unable to identify him. We conclude that this information was similarly immaterial, as the evidence supports a finding that the magistrate's probable cause determination did not hinge upon Nicholas' identification of Sawkow. The additional information in the Affidavit—including substantial evidence that gold was purchased by Sawkow from Plaza Coin with Hygin checks and the identification of Sawkow in the photo lineup by the owner and an employee of Plaza Coin—adequately established probable cause for the issuance of the Warrant.

Appellants have thus failed to demonstrate that material information was omitted from the affidavit, and hence the Warrant must stand unless appellants can prove, by a preponderance of the evidence, that Domino omitted information with the intent to mislead the magistrate or in reckless

disregard of the accuracy of the Affidavit. (*People* v. *Kurland, supra,* 28 Cal.3d at pp. 387-388, 390; *People* v. *Cook, supra,* 22 Cal.3d at p. 89.)

 In *Kurland* the court observed that demonstrating purposeful deception is a difficult burden, although not insurmountable. (*People* v. *Kurland, supra,* 28 Cal.3d at p. 391.) It may be evidenced by the affiant's admission, which we do not have at bench, or inferentially from the surrounding circumstances. (*Ibid.*; see *Morris* v. *Superior Court* (1976) 57 Cal.App.3d 521, 527 [129 Cal.Rptr. 238].)

 We have carefully reviewed the record on appeal, bearing in mind the factual determinations of the trial court, and that we must infer findings in support of that court's order, rather than seek a basis to upset it. (*People* v. *Superior Court* (*Keithley*) (1975) 13 Cal.3d 406, 410 [118 Cal.Rptr. 617, 530 P.2d 585].) We conclude that the facts before the court at the 1538.5 hearing are susceptible of an interpretation that would impute only careless (and perhaps therefore censurable), good-faith conduct to Officer Domino. The testimony before the court supports a finding that Domino believed, in good faith, that Nicholas' failure to "identify" Sawkow at the September 30 stakeout and in the photo lineup was inconsequential in view of the totality of the circumstances. Although the voluminous testimony before the trial court contains inconsistencies and contradictions, it contains no specific indicia of purposeful deception, and hence does not compel an inferred finding that the omissions in the affidavit were made with intent to mislead or in reckless disregard of its accuracy and completeness. We find no error as claimed.

The judgment is affirmed.

Thompson, J., and Johnson, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied April 4, 1984.