Filed 1/23/14  P. v. Smith CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C068027 |
| Plaintiff and Respondent, | (Super. Ct. Nos. 08F10648 & 09F8492) |
| v. | |
| JAMES EDWARD SMITH, | |
| Defendant and Appellant. | |

Defendant James Edward Smith contends the trial court erred in denying his motion to suppress evidence discovered during a search of his vehicle, and in denying his *Trombetta*[1] motion to dismiss on account of the loss of exculpatory evidence.

We disagree with defendant's contentions and affirm the judgment.  The trial court properly denied the motion to suppress evidence, as defendant was lawfully detained and the searches of his vehicle were based on his voluntary consent.  The trial court also

---

[1]    *California v. Trombetta* (1984) 467 U.S. 479 [81 L.Ed.2d 413] (*Trombetta*).

1

properly denied the *Trombetta* motion, as defendant failed to show the loss of potential evidence was the result of bad faith conduct by law enforcement officers, and that the lost evidence was material and exculpatory.

FACTS

Carol Macy's home in Anderson was burglarized in August 2009. Two brass sculptures of eagles worth $3,000 each were stolen.

Michael Darrow was a salesman for Northern California Glove and Safety Supply in November 2009. When he arrived to work the morning of November 9, 2009, he noticed his work van had been burglarized. The van was missing items he always kept in the van to sell: a large amount of batteries, Carhartt work clothing, and gloves. The items taken were valued at about $2,000.

That same day, November 9, at 11:45 a.m., Shasta County Sheriff's Deputy Lisa Green responded to a call and found defendant lying on the ground next to a parked car. She immediately detained him. Captain Jerry Shearman and Detective Donald Clegg also responded to the scene. Defendant gave the officers consent to search the car, first to locate documents that would prove he owned the car, and later to search the car generally.

The officers found two prescription bottles in the car's center console. One bottle contained marijuana. They found over 50 pairs of gloves and 50 eye goggles with attached tags and in the original packaging on the backseat. In the trunk, the officers found new jackets with reflective gear, cases of new batteries, and a bronze or brass eagle sculpture.

That afternoon, James Ortlieb, the owner of Northern California Glove and Safety Supply, identified many of the items found in defendant's car as products belonging to his company. Also, at a later time, Ms. Macy identified the brass eagle sculpture found in defendant's car as one of the two sculptures that had been stolen from her home.

2

Defendant pleaded guilty to misdemeanor possession of marijuana (Health & Saf. Code, § 11357, subd. (c)). A jury convicted him of receiving stolen property (Pen. Code, § 496, subd. (a)), and defendant admitted an enhancement under Penal Code former section 12022.1 that he was out on bail in another case, Shasta County case No. 08F10648, when he committed the instant crimes, which make up Shasta County case No. 09F8492.

The trial court sentenced defendant to a total prison term of 13 years eight months, based on a plea agreement that resolved both case Nos. 08F10648 and 09F8492. In the former case, defendant pleaded no contest to first degree burglary (Pen. Code, § 459) and admitted a prior serious felony allegation (Pen. Code, § 667, subd. (a)). The court sentenced defendant in case No. 08F10648 to the upper term of six years for the burglary plus five years for the serious felony prior, and it sentenced him in case No. 09F8492 to eight months (one-third the midterm) for the receiving stolen property conviction and two years for the on-bail enhancement, all terms to run consecutively.

Defendant filed notices of appeal in both cases, but his arguments concern only case No. 09F8492. He contends the trial court in case No. 09F8492 erred by denying his motion to suppress evidence and his *Trombetta* motion to dismiss.

DISCUSSION

I

*Motion to Suppress Evidence*

Defendant contends the trial court erred when it denied his motion to suppress the evidence obtained from the search of his vehicle. He contends (1) the officers lacked reasonable cause to detain him; (2) insufficient evidence supports the finding that the two prescription bottles found in the center console, their labeling, and their contents were in plain view; (3) his consent to search the car was involuntary; and (4) the search was not justified as an inventory search. We disagree with his contentions.

3

A.    *Facts presented at suppression hearing*

On November 9, 2009, at about 11:45 a.m., Shasta County Sheriff's Deputy Lisa Green responded to a call of "a man down." When she arrived at the scene, she found a red, two-door Ford Thunderbird parked off the roadway in a "pasture[-]like" area. The vehicle's trunk and a passenger door were open. Deputy Green parked her car behind the red vehicle.

About the time Deputy Green arrived, Shasta County Sheriff's Captain Jerry Shearman also arrived. He parked his unmarked vehicle near the Thunderbird's front left corner and facing the Thunderbird.

Deputy Green saw that a man, defendant, was down "on the ground area" at the back of the vehicle. Then defendant moved towards the car's passenger side where the door was open and peered around the car to see the vehicle that had just stopped in front of his. Deputy Green did not think defendant saw her. She called out to him. She recognized him from prior contacts. While she walked up to him, she observed items in the open trunk, but she did not know at that time what they were. She testified she "immediately detained [defendant] because I didn't know what was going on with the vehicle, what he was doing. Uhm, I recognize him from having prior contacts." She handcuffed him and directed him to sit by her car. She subsequently read him his *Miranda*[2] rights. Defendant waived his rights.

Deputy Green asked defendant what he was doing there. Defendant stated his car had broken down and he was trying to fix it. Captain Shearman joined the conversation and asked defendant who owned the car. Defendant stated he received the car secondhand through another party from either a friend or for doing some work, and that the paperwork in the car would explain it. Deputy Green asked defendant if they could

---

[2]    *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694].

4

look in the car for the paperwork, and defendant said they could. Captain Shearman asked where the paperwork would be. Defendant said he thought it would be in the glove box and would be either a bill of sale or a release of liability.

Captain Shearman entered the Thunderbird through the open passenger door and looked through the glove box. He found no paperwork in the glove box that named the car's owner. He told Deputy Green and defendant there was nothing in the glove box. He asked defendant where else the paperwork could be. Defendant said he was sure the paperwork was in the car. Captain Shearman asked if he could look, and defendant said, "[I]t's in there. Find it."

Captain Shearman returned to the vehicle. He looked again in the glove box to make sure no paperwork was there. He then looked under the dash, under the front seats, on the floorboards, behind the visors, along the doors, between the front seats, and in the center console. He found lots of debris, but he found no paperwork identifying ownership of the car.

While looking in the center console, however, Captain Shearman found two prescription bottles. One had a female's name on it, and the other had defendant's name on it. The latter bottle contained small packages of marijuana. Captain Shearman alerted Deputy Green of the bottles' presence in the car. Defendant said the marijuana belonged to his wife.

Captain Shearman went back to defendant and asked him again where the paperwork might be. Defendant had no answer. Captain Shearman asked defendant more questions about how he obtained the vehicle. Defendant stated he got it from somebody on a deal and he was sure the paperwork was inside the car. Captain Shearman stated he was going to continue his search for a third time, and defendant said he did not care because the paperwork was in the car. Captain Shearman again found nothing.

5

Captain Shearman and Deputy Green were concerned the car might have been stolen. They had found no paperwork documenting its ownership, and they had seen that part of the car's dash had been torn out. Captain Shearman ran the license plate and vehicle identification number, and he learned the car was owned by a Russell Fossett. The car had not been reported stolen, and the license plate and the vehicle identification number matched. Captain Shearman reported this to defendant. Defendant suggested Captain Shearman contact defendant's father, who had information on how the transaction took place. Captain Shearman dialed the phone number defendant provided him. The man on the other end of the line said he had obtained the car from doing a favor for a friend of a friend and that the car ended up going to defendant. The man had no information about where the pink slip or a bill of sale might be.

While Captain Shearman had been searching the car, Deputy Green had viewed the items stored in the open trunk with more attention. She noticed jackets and Carhartt safety jackets with reflective gear. They still had tags on them. There were also nylon mesh bags with items in them.

Through the car's windows and the open passenger door, Deputy Green also observed a number of items on the car's backseat. She saw boxes of gloves, protective eyewear still in packaging, and stereo speakers. It appeared to her the items were stolen property. Captain Shearman had noticed the same items on the backseat when he was inside the vehicle.

Deputy Green asked defendant about the items she had seen. He said he received them from yard sales and was planning to go to the flea market. He said he also received items from people as gifts in exchange for work. Believing that defendant might be in possession of stolen property, Deputy Green decided to tow the vehicle and perform an inventory of its contents. At about that same time, she arrested defendant for possession of another person's prescription and possession of marijuana.

Defendant consented to a search of his vehicle. Deputy Green asked Captain Shearman if he had a consent form for defendant to sign, but he did not and neither did she. Defendant, however, consented to the search. Deputy Green performed the search. She was assisted by Detective Clegg, whom she had contacted earlier for help in identifying some of the property. Captain Shearman also assisted Deputy Green in moving items from the car. Deputy Green took defendant's handcuffs off so defendant could speak freely with Detective Clegg.

Detective Clegg also asked defendant for permission to search the car. Defendant said he could. In addition, Detective Clegg asked defendant for permission to collect the items found in the car. Defendant gave him permission. Detective Clegg told defendant he would give him a receipt for everything he collected that he believed was stolen, and defendant agreed. As something was located in the car during the search, Detective Clegg would ask defendant where he got the item. Defendant never told the officers to stop searching.

The officers found a bronze statue of an eagle in the car's trunk. Detective Clegg recognized the statue as something that had been reported stolen in an earlier burglary. Detective Clegg also recognized the safety equipment as being similar to equipment he had seen in the warehouse of a safety equipment company a year prior to this incident. The officers also found several cases of new batteries still in their packaging.

B.    *Analysis*

1.    *Reasonable cause to detain defendant*

Defendant contends he was unlawfully detained without reasonable suspicion. He asserts Deputy Green detained him only because she recognized him from past criminal activity and because she saw him make the furtive gesture of peering around his car. These acts, he claims, did not give Deputy Green sufficient reason to detain him. We disagree with defendant's contentions and conclude under the totality of the circumstances that Deputy Green had reasonable suspicion to detain him.

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest. (*Terry* v. *Ohio* (1968) 392 U.S. 1, 9 [20 L.Ed.2d 889] [(*Terry*)]; *United States* v. *Cortez* (1981) 449 U.S. 411, 417 [66 L.Ed.2d 621] [(*Cortez*)].) Because the 'balance between the public interest and the individual's right to personal security' (*United States* v. *Brignoni-Ponce* (1975) 422 U.S. 873, 878 [45 L.Ed.2d 607]), tilts in favor of a standard less than probable cause in such cases, the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity ' "may be afoot" ' (*United States* v. *Sokolow* (1989) 490 U.S. 1, 7 [104 L.Ed.2d 1] (*Sokolow*) (quoting *Terry*, *supra,* at 30). (See also *Cortez* 449 U.S. at 417 ('An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity.').)

"When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing. (See, *e.g., id.* at 417-418.) This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.' (*Id.* at 418.) (See also *Ornelas* v. *United States* (1996) 517 U.S. 690, 699 [134 L.Ed.2d 911] (reviewing court must give 'due weight' to factual inferences drawn by resident judges and local law enforcement officers).) Although an officer's reliance on a mere ' "hunch" ' is insufficient to justify a stop (*Terry*, *supra,* at 27), the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard (*Sokolow, supra,* at 7)." (*United States v. Arvizu* (2002) 534 U.S. 266, 273-274 [151 L.Ed.2d 740, 749-751].)

We also acknowledge "the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest." (*Terry, supra*, 392 U.S. at p. 24.)

Viewing defendant's detention under the totality of the circumstances of this case, we conclude Deputy Green had a sufficiently particularized and objective basis for suspecting defendant was, or was about to be, engaged in criminal activity. Deputy Green was dispatched to the location based on a report of a "man down." That description would have indicated to her that someone was in serious need of assistance. Upon arriving, she saw a car with its trunk lid up and passenger door open, and it was parked off the roadway in something akin to a pasture. Upon parking her vehicle, she indeed saw a man down. At this point, she could have believed the man down was a crime victim. But when Captain Shearman arrived, Deputy Green saw the man get up off the ground, move to the open passenger door, and peer around the car to see who had arrived. She also observed items in the trunk as she approached defendant. Now, the situation was changed, and the open appearance of the car with a trunk full of items, and defendant off the ground and peering around the car as another officer approached him, rendered the situation much more uncertain. She could have reasonably believed she had to control the situation to learn what was happening and had to protect Captain Shearman. Under these circumstances, Deputy Green could have reasonably believed some type of criminal behavior was afoot, and she was justified to detain defendant.

At a minimum, the circumstances gave Deputy Green reasonable cause to investigate the status of the car, and that investigation would have inevitably led to defendant's arrest. Coming upon this particular scene, Deputy Green and Captain Shearman were justified in inquiring about the ownership and registration of the vehicle. Whether or not defendant was handcuffed, the officers would have learned defendant carried no proof of ownership or registration. State law requires a person in the immediate control of an automobile to present evidence of valid registration upon

9

command of a peace officer. (Veh. Code, § 4462, subd. (a).) The failure to do so may result in the person's arrest and his car being impounded and its contents inventoried. (*People v. Redd* (2010) 48 Cal.4th 691, 719-721.) Thus, defendant's detention and the subsequent search of his car did not violate the Fourth Amendment.[3]

2.    *Sufficiency of the evidence that prescription bottles were in plain view*

Defendant contends there is insufficient evidence to support the finding that he gave Captain Shearman consent to look inside the center console. Even if he gave Captain Shearman that consent, defendant claims there is insufficient evidence to support the finding that the prescription bottles' labeling and contents were in plain view. We disagree with his contentions.

Sufficient evidence supports the trial court's finding that defendant consented to Captain Shearman looking inside the center console. Defendant initially limited his consent to searching the glove box. But after Captain Shearman could not find any paperwork identifying ownership there, defendant told him the paperwork had to be in the car somewhere. Captain Shearman asked if he could look again, and defendant replied, "[I]t's in there. Find it." By this comment, defendant gave Captain Shearman consent to search anywhere inside the car, including inside the center console.

---

[3]    The Attorney General overstates the factual record in arguing in support of the detention's legality. She claims Deputy Green told defendant she suspected the car was stolen. The record does not indicate Deputy Green said this before she detained defendant. The Attorney General contends "Cal. Fire" had reported the car looked suspicious and suggested it might have been stolen. Deputy Green asserted this point in her written report, but there is no indication her report was admitted into evidence at the suppression hearing and considered by the trial court, and Deputy Green did not mention this fact in her testimony. Finally, the Attorney General asserts Deputy Green, while walking up to detain defendant, was able to view into the car's trunk and backseat and discern new items with sales tags still on them. Deputy Green actually testified that while walking up to detain defendant, she observed items in the trunk, but she did not examine them further until after she detained defendant. It was at that later time when she was able to describe the items she saw.

10

Sufficient evidence also supports the court's finding that Captain Sherman observed the prescription bottles, their labels, and their contents in plain view. Captain Shearman testified the prescription bottles, their labels, and their content were in plain view as he searched the center console. Captain Shearman stated that while searching in the console, he found the prescription bottles, including one for a female. The bottles were "generally see-through," and he could see through the bottle labeled for defendant and determine marijuana was inside. This was sufficient evidence to support the court's conclusion that Captain Shearman found the bottles, their labels, and their contents in plain view.

Defendant claims Captain Shearman would have had to pick up the prescription bottles in order to read the labels or view their contents, and picking up the bottles exceeded defendant's consent to search for paperwork documenting ownership of the car. We disagree. The evidence was that the bottles were in plain view, and there was no evidence that Captain Shearman had to pick them up to view them. Even if defendant limited impliedly the scope of his consent, his limited consent would not prevent Captain Shearman from retrieving what was in plain view. "Police officers do not have to blind themselves as to what is in plain sight simply because it is disconnected with the purpose for which they entered the premises. (*People v. Superior Court* (*Meyers*) (1979) 25 Cal.3d 67[, 73].) Objects falling in plain view of a law enforcement officer who has a lawful right to be in a position to have that view are subject to seizure and may be introduced into evidence. (*North v. Superior Court* (1972) 8 Cal.3d 301, 306.)" (*People v. Szabo* (1980) 107 Cal.App.3d 419, 431-432.)

In addition, even if the evidence had not been in plain view, it still would have been admissible at trial under the inevitable discovery exception to the exclusionary rule. Evidence found because of a Fourth Amendment violation is admissible if the prosecution can establish the evidence ultimately or inevitably would have been discovered by lawful means. (*Nix v. Williams* (1984) 467 U.S. 431, 444 [81 L.Ed.2d 377,

11

387-388].)  Here, the prosecution would have satisfied this test.  Reasonably believing the car may have been stolen, Deputy Green decided to tow the vehicle and perform an inventory search.  During this lawful search of the car, Deputy Green would have discovered the prescription bottles.  The court thus did not err in refusing to suppress this evidence.

3.     *Voluntariness of consent*

Defendant asserts his consent to Detective Clegg to search the vehicle was involuntary.  He cites no facts to support his assertion; instead, he states simply the legal maxim that "consent to search produced by an illegal arrest or detention is not voluntary."  (*People v. Valenzuela* (1994) 28 Cal.App.4th 817, 833.)  We have already concluded defendant's detention was lawful.  His arrest was also lawful, as it was based on probable cause of possessing marijuana and another person's prescription.  His consent to Detective Clegg was not coerced.

4.     *Search justified as an inventory search*

Defendant contends no evidence was produced at the suppression hearing to show the vehicle search was an inventory search.  Although Deputy Green's decision to perform an inventory search establishes the inevitable discovery exception, as we have explained, defendant's contention is irrelevant, as the searches of defendant's car were based on his consent following his lawful detention, and the items found that exceeded his consent were found in plain view.  The trial court correctly denied defendant's motion to suppress.

II

Trombetta *Motion to Dismiss*

After defendant was arrested for unlawfully possessing another's prescription and marijuana, his car was inventoried and then towed to a private tow yard for safekeeping.  The stolen items retrieved from the car were photographed after being removed from the

12

car and the items were returned to their lawful owners.  However, the private tow company sold the car when the impound fees exceeded the car's value.

Defendant filed a *Trombetta* motion to dismiss the action, claiming law enforcement violated his due process rights and denied him a defense by not photographing the stolen property inside the vehicle and by allowing the car to be sold. He asserted the car and its contents would have shown the plain view search claims made by law enforcement were unfounded because the car was so filled with junk and debris there was no way the prescription bottles or any of the stolen property could have been visible.  The trial court denied the motion.

Defendant contends the trial court's denial was error.  He asserts the officers acted in bad faith in failing to retain the car and its contents, and the lost evidence was material and exculpatory.  We conclude the trial court did not err.

If the prosecution collects material, exculpatory evidence, due process requires the prosecution to preserve it.  (*Arizona v. Youngblood* (1988) 488 U.S. 51, 58 [102 L.Ed.2d 281, 289]; *Trombetta, supra*, 467 U.S. 479.)  If the prosecution fails to preserve such evidence, the defense may make a motion for sanctions, called a *Trombetta* or *Youngblood* motion.

The showing the defense must make to obtain relief varies, depending on whether the loss of the evidence was in bad faith.  (*People v. Pastor Cruz* (1993) 16 Cal.App.4th 322, 324-325.)  A defendant who can establish the prosecution acted in bad faith in destroying or failing to preserve evidence is entitled to relief on a showing that the lost or destroyed evidence *might* have exonerated him.  (*Illinois v. Fisher* (2004) 540 U.S. 544, 547-548 [157 L.Ed.2d 1060, 1066].)  If the defendant cannot establish bad faith, he is entitled to relief only on a showing that the lost or destroyed evidence was material and exculpatory. (*Trombetta, supra,* 467 U.S. at pp. 488-489.)

Material, exculpatory evidence is evidence that might be expected to play a significant role in the suspect's defense.  It must possess an exculpatory value that was

apparent before the evidence was destroyed or lost, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.  (*Trombetta, supra,* 467 U.S. at p. 489.)

Defendant failed to demonstrate the officers acted in bad faith, or that the lost evidence was material and exculpatory.  Defendant submitted no evidence establishing the officers acted in bad faith in not taking pictures of the stolen property inside the car or not preventing the car from being sold.  His assertions of bad faith -- that the officers did not take pictures and lost the car in order to protect their ruse of claiming plain view -- are mere speculation.  *Trombetta* motions based on speculation are without merit. (*People v. Velasco* (2011) 194 Cal.App.4th 1258, 1265-1266.)

Defendant also submitted no evidence establishing the proposed pictures or the car were material and exculpatory evidence.  Obviously, the car was not material.  Defendant was not charged with any crime involving the car.  Also, the stolen items were removed from the car with defendant's consent and inventoried before it was towed.  Thus, the car itself would have served defendant no purpose.

As for the pictures defendant faults the officers for not taking, defendant cites to no authority that holds law enforcement officers are under a duty to create evidence. Also, such photos would not have been exculpatory.  Defendant consented to Captain Shearman searching inside the entire vehicle to look for ownership documentation.  This consent gave Captain Shearman authority to move the debris he found in the car in search of paperwork documenting ownership.  As he moved debris, the prescription bottles and the stolen goods would have come into plain view, and a photo of the car's interior at that time likely would not have shown them hidden.  The court did not err in denying defendant's *Trombetta* motion.

DISPOSITION

The judgment is affirmed.

      NICHOLSON      , Acting P. J.

We concur:

      HULL      , J.

      MAURO      , J.